[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 238 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 239 
Robert Lee Hall, Jr., sued Flint Construction Company alleging, among other claims, that Flint had discharged him in retaliation for his filing a claim for workers' compensation benefits. After a trial on the retaliatory-discharge claim, the jury returned a verdict in favor of Hall, awarding him $400,000 in compensatory damages and $200,000 in punitive damages. The trial court entered a judgment on the jury's verdict. Flint then filed a postjudgment motion for a judgment as a matter of law ("JML") or for a new trial, which was denied by operation of law pursuant to Rule 59.1, Ala. R. Civ. P. Flint appeals; we affirm.
 I. Factual Background and Procedural History
Flint, a Georgia corporation, is a construction company that installs pipeline systems for the natural-gas industry. Flint's business office is located in Lawrenceville, Georgia. The company does the majority of its work in Georgia, but it also does work on pipeline projects in other states. At all times pertinent to this appeal, Bob Good was the president of Flint, Terry Fuller was the vice president, James "Dooley" Eaves was the general superintendent, and Nelson Grams was the safety director and had the responsibility of dealing with workers' compensation claims.
Flint initially hired Hall in 1980 as a laborer at an hourly wage. From 1980 through 1986, Hall worked intermittently for Flint on various projects. In 1986, Flint offered Hall a permanent, full-time position as a foreman installing plastic pipe on large construction projects. As a foreman, Hall had supervisory authority over other employees and was paid a salary rather than an hourly wage. In weeks when Flint's employees were unable to work a full week on a project, salaried employees were guaranteed their pay for 50 hours of work even if they did not actually work that number of hours. Alternatively, when a project demanded that Flint's employees work overtime, salaried employees were paid for only 50 hours, even if they worked more. Because most of Flint's construction projects required Hall, an Alabama resident, to be away from home for extended periods, Flint also paid Hall a "living allowance" when he was working on projects too far away from home for him to return home at night.
On December 13, 1990, Hall injured his left knee on the job. He later reinjured the same knee. Flint paid Hall's medical expenses in connection with those injuries and paid temporary disability benefits for the days on which he missed work. On December 14, 1993, Flint and Hall settled his workers' compensation claim concerning the 1990 knee injury in the Pickens Circuit Court. The settlement petition filed with the court contained the statement: "[The parties] agree and represent unto the Court . . . [t]hat they are subject to the provisions of the [Workers'] Compensation Statute of Alabama, as amended." The petition was signed by Hall and by Anthony N. Fox as "Attorney for Flint Construction." The trial court approved the settlement and entered a final order in accordance with its terms. On May 16, 1996, Flint and Hall settled his workers' compensation claim concerning the reinjury *Page 240 
to his knee, again in the Pickens Circuit Court. The second settlement petition filed with the court also contained the statement: "[The parties] agree and represent unto the Court . . . [t]hat they are subject to the provisions of the [Workers'] Compensation Statute of Alabama, as amended." The petition was signed by Hall and by Fox as "Attorney for Flint Construction." The trial court approved the settlement and entered a final order in accordance with its terms. Hall stated that on one occasion when he was in Flint's main office, Grams showed him "some paperwork" concerning his injuries and informed him that at that point the expenses for his knee injury totaled over $68,000.
According to Hall, although he continued to work his left knee still bothered him. In late January 1996, Hall testified that he had a telephone conversation with Good in which he told Good about the problems he was having at work because of the pain in his knee. He said:
 "I called Bob from Savannah, Georgia and I told him the situation. And he told me, well — y'all excuse me, Bob and I had a close relationship and we always used first names. He said, `well, Lad, it's wintertime and you know things are slow.' He said, `you got things so you can leave?' I said, `yes, sir.' I said, `they don't want but a four-man crew down here, a welder and three workers with him.' And he said, `well, that been taken care of?' And I said, `yes, sir. The welder's here and Petro Fowler and Raymond King —' and, I believe, Earl Tyson was the three mens I was leaving down there with him. And he said, `well, you go home and take care of what you got to do to get your leg well and just when you get ready to come back, come back.' And I said, `yes, sir.' So, I left."
Good testified that he did not recall such a conversation.
In addition to the problems with his knee, Hall was diagnosed in March 1996 with diabetes, and he was hospitalized for several days in late March for that illness. Flint's employment records reflect that Hall did not work from January 26, 1996, until April 13, 1996. He was paid his full salary from January 26 until approximately three weeks before he returned to work. He was paid one-half of his regular salary for those three weeks.
Eaves, the general superintendent, testified that in March 1996 he tried repeatedly to reach Hall to find out where he was and why he was not working. Eaves says that when he could not reach Hall by telephone, he wrote him a letter. The record contains a letter to Hall from Eaves dated March 7, 1996, in which Eaves stated that if Flint did not hear from Hall within "a reasonable time frame (14 days)," his position would be considered vacated. Hall testified that he could not think of any reason why Eaves had not been able to reach him by telephone and that after receiving the letter from Eaves, he telephoned Good. He said:
 "I told him I was still off getting my leg better. And I told him I was, you know, generally sick, I just didn't have no strength. I didn't know what was wrong and I told him I was sick, too. And at this time, Bob told me, he said, `all right.' He said, `well, come back —' you know, he told me again to don't worry about it."
The record also contains a letter to Hall from Good dated March 20, in which Good stated that Hall would be discharged on April 6, 1996, unless he contacted Flint. After receiving that letter, Hall testified that he again telephoned Good. He said:
 "At this time, I had received a letter from Bob [Good]. And I called Bob from *Page 241 
the hospital and told him I was in the hospital and I was diagnosed as a diabetic. And he said, `diabetic?' He said, `well, that's sort of serious now.' And I said, `yeah. My blood sugar was over six hundred.' . . . He told me to get better and when I got better, to come back."
Hall returned to work full-time in April 1996.
James Eaves testified that among Flint's complaints about Hall was Hall's refusal to take a job assignment in Chattanooga, Tennessee, in February 1997. Hall testified that he had a conversation with Eaves in February 1997 at Flint's annual safety meeting in which Eaves told him he had three projects he needed help on — one in Chattanooga, one in Bastrop, Louisiana, and one in Atlanta, Georgia. Hall said Eaves gave him the option to choose where he would prefer to go, and he chose Bastrop. Hall said that he informed both Eaves and Grams, the safety director, at the safety meeting that he had a doctor's appointment the following Monday, but that on Monday morning, Eaves telephoned him at home and asked why he was not in Chattanooga. Hall said when he reminded Eaves he had a doctor's appointment, Eaves said, "you refusing the work?" Hall said he told Eaves that he was not refusing the work, but that he had to keep his appointment. At that point, Hall said Eaves said to him, "[W]ell, we don't have to pay you another dime on your knee." Hall said he then reminded Eaves that Eaves had given him the choice of going to Chattanooga or to Bastrop, and, although he said he was prepared to go to Bastrop, he asked Eaves what he wanted him to do. Hall said they had an understanding that he was to go to Bastrop, but that Eaves telephoned him later in the week and told him he was needed on a job in Tuscaloosa. After he was no longer needed in Tuscaloosa, Hall said, he went to work on the job in Bastrop.
Flint assigned Hall to the project in Bastrop in April 1997. The supervisor in charge of the Bastrop project was Kenneth "Kimbo" Eaves, James Eaves's brother. Hall reported to work in Bastrop. Hall testified that on April 8, 1997, he hurt his back while trying to help another worker pick up a concrete form. He says that after he picked up the form, he realized that his left knee would not bend to allow him to put the form down and that when he bent over to put the form down, he strained his back. Hall says that the pain radiated into his right leg.
Hall testified that he continued to work on the day of the injury and for several days thereafter until his pain became so severe that he was forced to seek treatment. He saw his family physician at home and then sought chiropractic care in Bastrop. In order to see the chiropractor, Hall had to obtain permission from Flint. Hall says that he gave the necessary form for medical treatment to Kenneth Eaves, who faxed it to Grams and later returned the completed form to Hall. Hall saw the chiropractor for several days, but he said that the treatments did not relieve his pain. He then attempted to see the orthopedic surgeon who had been treating him for his knee injury, Dr. Bony Barrineau, but experienced problems getting that visit authorized by Grams and Business Insurance Company ("BICO"), Flint's workers' compensation insurance carrier at the time. When Hall was able to see Dr. Barrineau, the doctor recommended that he have an MRI. Hall again experienced problems getting that procedure authorized by Grams and BICO, but after several days, he was able to obtain the MRI. Hall said that while he was waiting to obtain the authorization for the MRI, Grams told him to stay at home instead of going back *Page 242 
to the job in Bastrop. Hall's MRI was inconclusive, and he then underwent a myelogram. Flint provided medical treatment for Hall's back injury and temporary disability benefits associated with that injury in response to his workers' compensation claim.
Hall testified that shortly after the injury he reported his back injury to Richard Van Skike, another supervisor, because Kenneth Eaves had taken time off to attend his grandfather's funeral. The record reflects that Eaves was away from the Bastrop job site on April 9 and 10. Hall stated that Van Skike told him that he would take care of the paperwork relating to the injury. The record contains a "First Report of Injury" form dated April 8, 1997, that was faxed from Bastrop to Flint's business office on April 30. The record also contains a request for authorization of the chiropractor's treatment that was faxed from Bastrop to Flint's business office on April 30. Grams testified that he was not aware of Hall's back injury until he received the faxed documents on April 30. Grams acknowledged being involved after that point with authorizing medical treatment for Hall.
Although all of the other management or supervisory personnel at Flint testified that they knew nothing about Hall's injury or his attempts to obtain medical treatment, Hall testified differently. Hall said that after he notified Grams that he wanted to make an appointment with Dr. Barrineau, James Eaves telephoned Hall's home and left a message with his wife for Hall to telephone him before he went to the appointment with Dr. Barrineau. Hall stated:
 "The next morning, I called the office and I spoke to Dooley, which is James Eaves. And he said, `You need to speak with Nelson [Grams].' And I said, `Speak with Nelson?' He said, `Yeah.' I said, `Put him on the phone.' He said, `Well, he ain't here right now. He'll probably be back tomorrow.' I said, `What's this about?' And he said, `Dr. Barrineau is not on our HMO list.' . . . I said, `Well, he already treated me for my leg.' I said, `He's not on the list?' And he said, `Yeah, but you need to take it up with Nelson.' So I said, `Okay.'"
Hall also testified about a telephone conversation he had with Terry Fuller, the vice president of Flint, while he was in Bastrop.
 "Q. You said [a conversation with James Eaves about an expense allowance] was about the time you had the conversation — this is before June4 —
"A. Yes, sir.
"Q. — with Terry Fuller about an MRI?
 "A. Yes, sir. It was — when I got off the phone with Dooley, I was still in our office trailer out there in Bastrop, Louisiana. So, I called back and asked to speak to Terry, and I was telling Terry what was going on.
 "He told me, he said, `Well, I hadn't heard you were getting treatment about your back.' And I said, `Yeah, they denied me an MRI.' He said, `MRI?' I said, `Yeah.' He said, `I had one of those.' He said, `Man, they put you in something like a tube and it be like somebody hitting it with a sledge hammer.' I said, `Yeah?' He said, `Yeah.' And he said, `It ain't nothing to it. It just make a lot of noise.' And I said, `Well, they been denying me an MRI.'
 "Q. Had you told him that you'd hurt yourself on the Bastrop job?
 "A. Yeah. When I told him that, he said, `Well, I heard that you wasn't *Page 243 
being on the job.' And I said, `Well, they never told you I was trying to get medical attention?' And he said, `No.' And I said, `Well, they never told you a lot of things.' . . ."
Kenneth Eaves testified that he was dissatisfied with Hall's attendance record on the Bastrop project. He said that Hall worked fewer hours than the other men and that he was often absent or left work without telling anyone where he was going. Kenneth Eaves said that he telephoned his brother, James, to complain about Hall's attendance and that when James asked him for details, he responded with a memorandum and time records from the Bastrop project. On May 20, 1997, Kenneth Eaves wrote a memorandum to his brother James about Hall's absences from the Bastrop job site. The memorandum stated:
 "The time sheets will show that most of the men worked more than the average work hrs, these are the men that are dependable and help Rick's Project. [Hall] has had more than average problems, court dates on Sunday, problems of some kind each weekend, and Doctor's appt's every so often.
 "[Hall] has only attended 2 Monday morning Safety Meetings since he started April 7, '97. He has had personal problems to attend to.
 "As you know I have terminated many employees due to poor attendance. I have allowed [Hall] to get by with more than anyone, ever."
On June 4, 1997, Good, Fuller, and James Eaves met and discussed Hall's employment. They all testified at trial that they discussed Hall's poor attendance record and agreed that day to discharge him. They all testified at trial that they were unaware that Hall had reported a work-related injury in Bastrop and that they were unaware that he was receiving any medical treatment as a result of that injury. James Eaves then wrote Hall a letter dated June 4. The letter stated in its entirety:
 "Due to current circumstances Flint Construction finds it necessary to terminate your services. This termination is effective June 6, 1997.
 "Attached to this letter is your final payroll check due to you from Flint. Please notice that under the deductions section of the check that we have deducted your petty cash. Should you have any cash receipts to turn in please forward them to the office and we will issue you a check for the appropriate amount.
"Should you have any questions please contact me."
On Friday, June 6, Hall filed the necessary paperwork with the Georgia Department of Labor to obtain unemployment benefits. The initial form, called a separation statement, provided for both the claimant's statement and the employer's statement. The form contained a line that stated "I am no longer employed with this employer because" followed by boxes to check that indicated "Lack of work," "Quit," or "Discharged by." Hall checked the box on the form to indicate that he had been discharged. When asked to give details, he stated: "See attached letter[,] no reason given." The form was then apparently sent to Flint for completion of the employer's statement. That portion of the form contained a line that stated: "Reason for separation" followed by boxes to check that indicated "Lack of work," "Discharge," and "Quit." A Flint employee who stated that she was an administrative assistant checked the box on the form to indicate that Hall had been "separated" from employment because of lack of work. She dated the employer's statement Thursday, June 12, 1997. *Page 244 
Hall said that the Monday following his discharge, he spoke with Good, Fuller, and James Eaves by telephone to ask why he had been discharged. He stated that they told him that Flint did not have work for him to do. He said he asked Good for the telephone number of a construction company that competed with Flint and that Good provided the number. Hall testified that the other company offered him a job doing similar work to the work he had done at Flint, but that the company wanted him to report to work the following Monday, which he said he could not do because he was still undergoing medical treatment for his back injury. When Hall was released by his doctor to return to work, he obtained employment with E M Construction, an Alabama business. Although Hall's present working situation is closer to his home, he works for hourly wages and has no benefits.
On June 13, the Georgia Department of Labor sent a document entitled "Claims Examiner's Determination" to Flint and Hall. That form stated, in pertinent part:
"SECTION II — LEGAL BASIS FOR DETERMINATION
 "Section 34-8-194(2)(A) of the Employment Security Law says that you cannot be paid unemployment benefits if you were fired from your most recent employer for not following your employer's rules or orders. In addition, you may not be paid unemployment benefits if you were fired for failing to perform the duties for which you were hired, if that failure was within your control. . . .
"SECTION III — REASONING
 "You were let go by your employer because there was no work to do. You are unemployed due to a lack of work. You can be paid unemployment benefits.
". . . .
"SECTION V — APPEAL RIGHTS
 "This determination will become final unless you file an appeal on or before 06/30/97. If you wish to appeal, submit a written request to the above address. . . .
". . . .
 "The determination on the reverse side was based on information provided as of the date of the predetermination fact-finding interview. If you disagree with the determination and wish to appeal, you may do so by stating the reason below. . . ."
(Emphasis added.) Flint did not appeal.
Hall sued Flint in April 1999, seeking workers' compensation benefits for his back injury and asserting claims alleging retaliatory discharge and intentional infliction of emotional distress (tort of outrage). Hall later amended his complaint to add fraud claims. In July 1999, Flint filed a motion to dismiss, arguing that the trial court lacked jurisdiction over the action because, it argued, Georgia's workers' compensation law applied to Hall's claims. The trial court denied that motion. Flint then filed a petition for a writ of mandamus with this Court. We denied the petition. Ex parte Flint Constr. Co., 775 So.2d 805
(Ala. 2000). Flint then moved for a summary judgment on all claims. The trial court entered a judgment in favor of Flint on Hall's tort-of-outrage claim, but denied Flint's motion as to Hall's other claims.
Meanwhile, the trial court severed Hall's workers' compensation claim from the other claims in the case. On June 17, 2002, Flint and Hall settled his workers' compensation claim concerning the 1997 back injury in the Pickens Circuit Court. The settlement petition filed with the court *Page 245 
contained the statement: "[The parties] agree and represent to the Court . . . [t]hat they are subject to the provisions of the Workers' Compensation Act of Alabama, as amended." Hall signed the petition above the typewritten words "PLAINTIFF/EMPLOYEE, Robert Lee Hall, Jr." Sarah C. Pflaum signed the petition above the typewritten words "DEFENDANT/EMPLOYER FLINT CONSTRUCTIONCOMPANY By Its Attorney, SARAH CARLISLE PFLAUM." The trial court approved the settlement and entered a final order in accordance with its terms.
The case proceeded to trial on Hall's retaliatory-discharge and fraud claims. At trial, Good, Fuller, and the Eaves brothers all testified that Hall's poor attendance record was a problem for Flint. Good, Fuller, and James Eaves testified consistently with their pretrial depositions that Hall's absences were a significant factor in their decision to discharge him. At trial, however, they also said that they had learned that Hall spent time gambling in casinos when he should have been working, and that his gambling on company time was also a factor in their decision to discharge him. Flint introduced records from a casino located in Philadelphia, Mississippi, that showed dates of usage of a card issued by the casino to Hall; those dates were dates Hall should have been on the job. However, Hall's wife testified that she went to the casino from time to time without her husband, that she used his card most of the time, and that one of their daughters "constantly" used his card.[1]
Flint also called as a witness JoAnne Jacob, a former clerical employee at Flint, who testified that she had seen Hall and had spoken to him at the casino in Philadelphia on May 17, 1997 (a Saturday). She did not recall what time they had spoken to one another. Jacob said that she happened to mention to Grams in casual conversation that she had seen Hall at the casino but that she had not spoken with anyone else at Flint about it. Jacob also stated that no one at Flint said anything to her in June 1997 about having seen Hall at the casino. On cross-examination, Good, Fuller, and James Eaves each admitted that he had not mentioned gambling when he gave his pretrial deposition and was asked to state the reasons for Hall's discharge. Jacob said that sometime after she left Flint's employ in June 1998, either Terry Fuller or one of Flint's lawyers telephoned her and asked her the exact date she had seen Hall at the casino in Philadelphia. She said she had to check her credit-card bill before she was able to recall the date.
Flint moved for a JML at the close of Hall's evidence and again at the close of all the evidence. The trial court granted the motion at the close of Hall's evidence only as to his fraud claims and denied the motion as to the retaliatory-discharge claim at the close of all the evidence. Only the retaliatory-discharge claim was submitted to the jury. The jury returned a verdict in favor of Hall, awarding him $400,000 in *Page 246 
compensatory damages and $200,000 in punitive damages. Flint then filed a postjudgment motion for a JML or a new trial, which, as previously noted, was denied by operation of law.
 II. Jurisdiction
We first address Flint's renewal of its argument that the trial court did not have jurisdiction to hear Hall's retaliatory-discharge claim because, it argues, that claim should have been brought in Georgia. Section 6-5-430, Ala. Code 1975, gives Alabama courts jurisdiction over claims arising under the laws of another state. Section 25-5-35, Ala. Code 1975, a part of the Alabama Workers' Compensation Act, allows the Alabama Workers' Compensation Act to apply to work-related injuries that occur outside Alabama, so long as the law of the other state is not applicable and when certain facts exist. As previously noted, Flint had settled two previous worker's compensation claims brought by Hall as well as the claim in the instant case, with a recitation in each agreement, "[The parties] agree and represent unto the Court . . . [t]hat they are subject to the provisions of the [Workers'] Compensation Statute of Alabama, as amended." Flint is therefore estopped under Alabama law from asserting different facts to prevent the Alabama Workers' Compensation Act from applying. See Ex parte First AlabamaBank, 883 So.2d 1236 (Ala. 2003); Ex parte Flint Constr. Co., supra, 775 So.2d at 807-08. Flint is likewise estopped from asserting different facts to argue that Georgia law, rather than Alabama law, should apply to this case.[2] Our resolution of these issues in Hall's favor makes it unnecessary for us to address Flint's argument that the trial court erred in admitting into evidence the three workers' compensation settlement petitions.
 III. Retaliatory Discharge
As a general rule in Alabama, an employment contract for an indefinite period is terminable at will by either party, with or without cause or justification. Hoffman-LaRoche, Inc. v.Campbell, 512 So.2d 725 (Ala. 1987). The Legislature carved out an exception to that general rule, however, with regard to a discharge of an employee in the aftermath of the filing of a workers' compensation claim. Section 25-5-11.1 provides:
 "No employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits under this chapter. . . ."
We now turn to Flint's argument that Hall did not prove the elements of a retaliatory discharge.
 A. Standard of Review
This Court applies the same standard of review to a ruling on a motion for a JML as the trial court used in initially deciding the motion. This standard is "materially indistinguishable from the standard by which we review a summary judgment." Hathcock v.Wood, 815 So.2d 502, 506 (Ala. 2001). We must decide whether substantial evidence was presented to the jury, which, when viewed in the light most favorable to Hall, would warrant a jury verdict in his favor. If so, the trial court did not err in not granting Flint's motions for a JML. City of Birmingham v.Sutherland, 834 So.2d 755 (Ala. 2002). "Substantial evidence is evidence of such weight and quality that fair-minded *Page 247 
persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v.Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). Furthermore, "we review the record as of the time the motion for a JML was renewed at the close of all the evidence."Alabama Power Co. v. Aldridge, 854 So.2d 554, 561 (Ala. 2002).
 B. Elements of a Prima Facie Case
In Aldridge, we clarified the rule that "[a] plaintiff must prove a causal connection between the workers' compensation claim and the subsequent discharge in order to establish a prima facie case." 854 So.2d at 563. We then reiterated the elements that a plaintiff must prove to establish a prima facie case of retaliatory discharge:
 "In order for an employee to establish a prima facie case of retaliatory discharge the employee must show: 1) an employment relationship, 2) an on-the-job injury, 3) knowledge on the part of the employer of the on-the-job injury, and 4) subsequent termination of employment based solely upon the employee's on-the-job injury and the filing of a workers' compensation claim."
854 So.2d at 563.
It is undisputed that Hall proved the first two elements. He was employed by Flint, and he injured his back at work. However, Flint argues that its decision-makers were not aware that Hall had been injured or that he had filed a workers' compensation claim. Flint also argues that it was entitled to a JML because, it argues, Hall did not prove that he was discharged solely
because he filed a claim for workers' compensation benefits, relying on that portion of Aldridge in which we stated that "where a conclusive determination can be made that retaliation is not the sole basis for the discharge a judgment as a matter of law is appropriate." 854 So.2d at 568. We address the evidence presented of those two elements in succeeding subsections.
1. Whether Hall Offered Substantial Evidence of "Knowledge onthe Part of the Employer of the On-the-Job Injury."
Flint relies on the testimony of Good, Fuller, and James Eaves (hereinafter sometimes referred to collectively as "the decision-makers") in arguing that they did not know Hall had injured his back while working in Bastrop and that, therefore, Hall has not established a prima facie case of retaliatory discharge. The decision-makers all testified that although they knew that Hall's knee problems were the result of work-related injuries, they knew nothing about any injury to his back when they made the decision to discharge him. Hall maintains, however, that the facts are disputed as to whether the decision-makers knew about the injury to his back, relying upon his testimony at trial describing in detail his telephone conversations with Fuller and James Eaves well before June 4 during which information concerning his back injury was conveyed. Hall also argues that circumstantial evidence supports an inference that the decision-makers learned of his injury from Nelson Grams, the safety director. According to testimony presented to the jury, Flint's main office is not large, the offices of the decision-makers and Grams are in close proximity to one another, and the corporate personnel shared a common coffee room where they tended to congregate and converse. The jury had before it substantial evidence that, if accepted, as it obviously was, would support the conclusion that the decision-makers were aware that Hall had suffered an on-the-job injury to his back. *Page 248 
2. Whether Hall Offered Substantial Evidence of "SubsequentTermination of Employment Based Solely Upon the Employee'sOn-the-Job Injury and the Filing of A Workers' CompensationClaim."
Flint insists that Hall was not discharged because he had filed a workers' compensation claim, but that he was discharged because his absences were excessive and had become a problem for Flint. Flint maintains that the evidence showed that Hall worked far fewer hours than the other men working on the job in Bastrop, that some of Hall's absences could have been attributable to Hall's being at a gambling casino when he should have been working, and that his absences from work had been a problem during 1996, the year before he was discharged. Therefore, Flint concludes, Hall has not established a prima facie case of retaliatory discharge because, it argues, retaliation was not the sole basis for Hall's discharge. Hall argues, however, that the facts are disputed as to whether Flint discharged him because he filed a workers' compensation claim or for some other reason.
Circumstantial evidence of a causal connection between a workers' compensation claim and an employee's discharge is appropriate in a retaliatory-discharge action. Culbreth v.Woodham Plumbing Co., 599 So.2d 1120 (Ala. 1992). This Court identified in Aldridge certain factors that can be considered as circumstantial evidence of a causal connection between an employee's filing a workers' compensation claim and that employee's discharge.
 "`1) knowledge of the compensation claim by those making the decision on termination, 2) expression of a negative attitude toward the employee's injured condition, 3) failure to adhere to established company policy, 4) discriminatory treatment in comparison to similarly situated employees, 5) sudden changes in an employee's work performance evaluations following a workers' compensation claim, and 6) evidence that the stated reason for the discharge was false.'"
854 So.2d at 564-65 (quoting Chhim v. University of Houston,76 S.W.3d 210, 218 (Tex.Ct.App. 2002)). Furthermore, we observed that "[m]any states also consider `[p]roximity in time between the filing of the workers' compensation claim and discharge' a persuasive factor in establishing a causal connection."Aldridge, 854 So.2d at 565 (quoting Rebarchek v. Farmers Coop.Elevator Mercantile Ass'n, 272 Kan. 546, 555, 35 P.3d 892, 899
(2001)).
Several of the foregoing elements are present in this case. Hall was injured on April 7, 1997, and filed a worker's compensation claim shortly thereafter; he was discharged approximately two months later on June 4, 1997. As previously discussed, whether the decision-makers knew that Hall had injured his back at work was a jury question that the jury resolved in Hall's favor. In addition, Hall presented evidence the jury could have interpreted as indicating a negative attitude on the part of the decision-makers toward his injured condition. Hall testified that Grams had pointed out to him how much money his knee injuries had cost Flint. Hall also testified that he had experienced difficulty in obtaining authorization from Grams for both an appointment with a doctor and for medical tests requested by that doctor in an effort to diagnose the specific injury to his back so that appropriate treatment could be started. Whether Flint's stated reason for Hall's discharge was false was also a jury question that the jury resolved in Hall's favor. The jury had before it not only contradictory testimony from witnesses who testified, but also the evidence about the various reasons Flint proffered for Hall's discharge. *Page 249 
A review of the record reflects not only that the evidence concerning the critical issue of why Hall was discharged is far from clear, but also that Flint's reasons shifted and changed with time, especially after Hall instituted this litigation. Initially, Flint told both Hall and the Georgia Department of Labor that Hall was discharged because it had no work for him to do, despite the fact that the Bastrop project had not been completed when Hall was discharged. After Hall initiated this action against Flint, the decision-makers testified in depositions. In their depositions, Good, Fuller, and James Eaves all said that Hall was discharged for two reasons — because he had expressed a preference for construction work over installing plastic pipe and no construction work was available, and because of his poor attendance on the job. Good stated that he did not recall giving Hall permission in January 1996 to take some time off while work was slow in order to allow his knee to heal. The decision-makers all testified that they did not know the reasons for Hall's extended absence during the early part of 1996, that his attendance had been a problem for Flint for some time, and that his leaving work early and missing work on the Bastrop project created morale problems with the other employees on that job, many of whom were working seven days a week. James Eaves testified at length about the problems he said were caused by what he described as Hall's unexplained absences from job sites, stating that Hall often left a job site without telling anyone where he was going or why he was leaving. During their trial testimony, all three men insisted that during the meeting in which they decided to discharge Hall, they talked not only about his absences, but also his visiting a gambling casino while he should have been at work. James Eaves specifically stated that "the last straw was when we found out that he was at the casino when he was supposed to be at work."
On cross-examination, the decision-makers acknowledged that no one ever asked Hall whether he would be willing to work installing plastic pipe, as he had done in the past, if the construction work he said he preferred was not available. As previously noted, Good, Fuller, and James Eaves never mentioned in their depositions the issue of Hall's allegedly visiting a gambling casino while he should have been at work, even though they had been asked to state all the reasons that motivated his discharge. All continued to insist at trial that they had discussed the casino at the time of Hall's discharge and that Hall's presence there had been a factor in the decision to discharge him. Even though the decision-makers testified about the problems Hall's absences from job sites had caused, it is undisputed that there is no documentary evidence criticizing his work and that the only documentary evidence criticizing his attendance consists of the letters from Good and James Eaves written in 1996 and the memo from Kenneth Eaves written shortly before Hall was discharged in 1997. Indeed, the decision-makers testified that Hall did excellent work, although they qualified that description by adding "when he was on the job," and confirmed that his work had not been criticized in any of his performance evaluations. In insisting that Hall had been discharged because Flint did not have any "work [Hall] wanted to do" and because of his poor attendance record, the decision-makers disavowed and thereby contradicted the reason Flint gave to the Georgia Department of Labor for Hall's dismissal — that Hall had been discharged because of a lack of work. Good testified that the form had probably been completed by a clerical employee who was unaware of the actual reason for Hall's discharge, and that although most of the employees Flint discharged *Page 250 
were discharged because of a lack of work, that was not true in Hall's case.
It is axiomatic that it is the jury's province to resolve conflicts in testimony, Wright v. Mills, 590 So.2d 177 (Ala. 1991), and to judge the credibility of witnesses, Floyd v.Broughton, 664 So.2d 897 (Ala. 1995). On proper instruction, a jury concluding that any witness was willfully not truthful about one material aspect of his or her testimony is free to disregard all or any part of the testimony. See Franklin v. Cannon,565 So.2d 119, 121 (Ala. 1990). The trial court here charged the jury as follows:
 "Now, you will be the sole and exclusive judges of the facts in this case. It will be your duty to attempt to reconcile the testimony of all the witnesses so as to make them all speak the truth, if this can be done reasonably. If you cannot reasonably reconcile all the testimony, it is then your duty to consider the testimony with the view of determining what the true facts are.
 "Now, in determining what the true facts are from the evidence, you may take into consideration any natural interest or bias a witness may have as a result of any connection with the case. You may take into consideration the interest or bias a witness may have shown while testifying. You may take into consideration the demeanor of any witness, as to whether that witness has apparently testified frankly or evasively. . . .
 "Now, you will be the sole judges of the credibility of the witnesses. You may accept or reject any part of the testimony of any witness and you should accept only the testimony you consider worthy of belief. Now, if you find that any witness has willfully sworn falsely as to any material fact in the case, you may disregard the testimony of that witness in its entirety."
(Emphasis added.) If the jury believed that the decision-makers knew about Hall's back injury, then the jury also could have concluded that Flint discharged Hall from his employment because of that injury and because he had filed a workers' compensation claim and thereafter gave varying reasons for Hall's discharge in an effort to establish that his back injury and the fact that he had filed a workers' compensation claim either were not the reasons or were not the only reasons he was discharged.
 C. Pretext
We now turn to the question whether a conclusive determination can be made in this case as to sole causation. We have concluded that Hall made out a prima facie case, justifying the trial court's denial of Flint's motion for a JML at the conclusion of Hall's evidence. After a defendant in a retaliatory-discharge action has presented legitimate reasons for the plaintiff's discharge, "`"[t]he plaintiff then has the burden of going forward with rebuttal evidence showing that the defendant's [stated] reasons"' for [discharging] the plaintiff are not true."Culbreth, supra, 599 So.2d at 1122 (quoting Twilley v. DaubertCoated Prods., Inc., 536 So.2d 1364, 1369 (Ala. 1988), quoting in turn Pushkin v. Regents of the Univ. of Colorado,658 F.2d 1372, 1387 (10th Cir. 1981)). In answering that question, "we review the entire record, not merely the evidence as it stood at the time [the defendant] first moved for a JML." Aldridge,854 So.2d at 568.
Flint argues that Hall has not produced any evidence indicating that Flint's stated reason for his discharge (that he was fired because of his record of unexcused absences from work and his presence at casinos on workdays) was pretextual. Flint insists that by presenting evidence of its legitimate reason for discharging Hall, it has rebutted any inference *Page 251 
of retaliation raised by Hall's initial showing. Flint further argues that because it presented evidence of Hall's sporadic attendance at work, coupled with evidence of his regular attendance at gambling casinos and frequent absences despite infrequent medical appointments, any evidence offered by Hall to rebut Flint's stated basis for his discharge would have been insufficient to allow the jury to conclude that his worker's compensation claim was the sole basis for his discharge.
We disagree. As this Court stated in Culbreth, supra:
 "Alabama's workers' compensation laws should be liberally construed in favor of the employee in order to advance and effectuate their beneficent purposes. If we were to say that, as a matter of law, the reason given by [the employer] is a conclusively legitimate reason, the beneficent purposes of § [25]-5-11.1 would be significantly undermined. An employer could almost always say either `we hired someone to take your place,' or `we no longer have enough business to continue your employment.' Thus, we think a jury question is presented as to whether [the employer's] asserted reason is a legitimate one or only a pretext."
599 So.2d at 1123 (citation omitted). As previously noted, Hall presented evidence challenging the credibility of the decision-makers' testimony. The issue of Hall's allegedly gambling when he should have been working is illustrative of the credibility challenges presented to the jury for resolution. The decision-makers testified that discovering that Hall had been at a gambling casino when he was absent from work was the "straw that broke the camel's back." Despite the professed importance of that discovery, however, none of the decision-makers mentioned gambling or casinos in their depositions in response to questions that should have elicited such testimony. Furthermore, although JoAnne Jacob testified that she mentioned to Grams in 1997 that she had seen Hall at the casino, she also testified that no one questioned her further about the incident until long after Hall's discharge had taken place.
In addition to the foregoing evidence, the jury also could have considered evidence indicating the use of Hall's casino player's card, relied upon by Flint to show when Hall was present at the casino, did not necessarily reflect Hall's presence there, but often reflected the presence of his wife or his daughter. Viewing the evidence in a light most favorable to Hall, the nonmovant, as we are required to do, Waddell Reed, Inc. v. United InvestorsLife Ins. Co., 875 So.2d 1143 (Ala. 2003), the jury could have concluded that Flint relied upon Hall's casino attendance after the fact to bolster its pretextual reason to explain his discharge — his poor attendance at work.
Furthermore, the jury could have concluded that no one at Flint ever criticized Hall about his absences from work and that he did not know that Flint considered those absences sufficiently problematic to be a ground for his discharge. Indeed, at the time of the discharge, Flint told Hall only that he was being discharged because it had no work for him. Additionally, the jury had before it the various reasons Flint provided at various times for Hall's discharge in June 1997 — to the Georgia Department of Labor, in deposition testimony, and at trial. The jury could have inferred from the fact that Flint's stated reasons for Hall's discharge shifted and changed that all of the reasons Flint gave for Hall's discharge were pretextual. See Motion Indus., Inc. v.Pate, 678 So.2d 724 (Ala. 1996) (employee presented sufficient evidence of pretext where record reflected *Page 252 
discrepancies between supervisor's trial testimony and deposition testimony); Coastal Lumber Co. v. Johnson, 669 So.2d 803 (Ala. 1995) (employee presented sufficient evidence of pretext where employer changed its stated reason for discharging employee and where employer's records did not support alleged reason for discharge); Culbreth, 599 So.2d at 1123 (employee presented sufficient evidence of pretext where employer waited to inform employee of reason for discharge until after those who made decision to discharge had a private conference). See alsoWaldrip Wrecker Serv., Inc. v. Wallace, 758 So.2d 1110
(Ala.Civ.App. 1999) (evidence showed discrepancies between employer's deposition testimony and its trial testimony);Etheredge v. Flowers, 766 So.2d 842 (Ala.Civ.App. 1999),overruled on other grounds, Ex parte Progress Rail Servs.Corp., 869 So.2d 459 (Ala. 2003) (employee presented evidence of positive job evaluations during probationary period that created doubt about employer's stated reason for her discharge). We cannot say as a matter of law that the jury could not have concluded that Flint's stated reason for Hall's discharge was pretextual without impermissibly reweighing the evidence. Consequently, Flint was not entitled to a JML, and the trial court properly denied its postjudgment motion on that basis.
We conclude that in light of the foregoing, Flint was not entitled to a JML. As we stated in Aldridge:
 "An employer's stated basis for a discharge is sufficient as a matter of law when the underlying facts surrounding the stated basis for the discharge are undisputed and there is no substantial evidence indicating (a) that the stated basis has been applied in a discriminatory manner to employees who have filed workers' compensation claims, (b) that the stated basis conflicts with express company policy on grounds for discharge, or (c) that the employer has disavowed the stated reason or has otherwise acknowledged its pretextual status."
854 So.2d at 568. First, in this case, unlike in Aldridge, the underlying facts surrounding the stated basis for Hall's discharge are disputed. For example, whether there was a lack of work, whether any of the decision-makers knew about Hall's injury and his worker's compensation claim and when that person knew it, and whether Hall's absences were unexcused or unexplained were all disputed facts. Further, here, unlike in Aldridge, Flint's stated reasons changed with the passage of time. Even if we were to conclude that the facts underlying Flint's stated reason for discharging Hall were undisputed, a JML is not appropriate where, as here, the employer subsequently contradicts the reason it initially gave for the discharge, thereby at least implicitly disavowing it or by such action acknowledging its pretextual status, giving rise to a jury question as to the credibility of the employer's evidence as to the reason for the employee's discharge.[3] *Page 253 
 IV. Damages
Having concluded that Flint was not entitled to a JML, we turn to its arguments that the damages awarded by the jury were improper.
 A. Mitigation of Compensatory Damages
The jury awarded Hall $400,000 in compensatory damages. Flint's only challenge to this award is an argument that the trial court erred in failing to find that Hall did not mitigate his damages. After the close of all the evidence, Flint moved for a JML on the ground that Hall "had an opportunity to completely mitigate his damages and failed to do so." After denying the motion for a JML, the trial court charged the jury as follows:
 "This is the charge as to mitigation. It is the duty of the one injured to exercise ordinary care to reduce his damages. He is bound to exercise such care as a reasonably prudent person would exercise under like circumstances to reduce or mitigate the damages. He can recover only such damages as would have been sustained had such care been exercised."
Flint contends that because Hall turned down a job offer with a company that would have provided him with a salary and benefits comparable to those he received at Flint, he failed to mitigate his damages. Hall testified that he discussed the job referred to by Flint with the owner of the company, but that he and the owner never agreed upon the actual details of the job offer. Furthermore, Hall testified that if he had accepted the job offer, he would have been required to report for work immediately, and he had not yet been released by his doctor to return to work when the job offer was made. Because the evidence concerning Hall's ability to mitigate his damages was conflicting, we conclude that the trial court properly denied Flint's motion for a JML as to this issue and properly submitted the question to the jury for resolution. Absent an affirmative showing that the jury ignored the trial court's instruction to consider Hall's duty to mitigate his damages, error cannot be presumed on appeal, where the trial court properly charged the jury regarding that duty. See Empiregas, Inc. v. Hardy,487 So.2d 244 (Ala. 1985). Therefore, we affirm the judgment insofar as it awarded $400,000 in compensatory damages.
 B. Punitive Damages
The evidence indicating that Flint discharged Hall solely because he had filed a workers' compensation claim was sharply contested in this case. Nevertheless, as we have previously concluded, the jury had before it substantial evidence to support Hall's claim that the decision-makers knew he had sustained a back injury at work and that he was discharged solely because of his having filed a workers' compensation claim. In addition to the compensatory-damages award, the jury awarded Hall $200,000 in punitive damages.
Flint contends that the trial court erred in entering a judgment on the punitive-damages verdict because, it argues, Hall *Page 254 
did not present clear and convincing evidence that Flint "`consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to [Hall],'" citing Heil Co.v. Crowley, 659 So.2d 105, 108 (Ala. 1995) (quoting §6-11-20(a), Ala. Code 1975). Section 6-11-20(b)(4), Ala. Code 1975, defines "clear and convincing evidence" as follows:
 "Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."
Flint argues that Hall presented no evidence of malice on its part or of a pattern or practice of Flint's discharging employees who had filed workers' compensation claims. If anything, Flint argues in its brief, "the record demonstrates Flint's generosity in settling Hall's prior workers' compensation claims and allowing him excused absences for medical treatment." Hall argues that he presented ample evidence, "including testimony of blatantly false reasons why Flint fired Hall and incredible denials of knowledge of Hall's injury," from which the jury could have concluded that punitive damages were warranted. Hall contends that in the absence of evidence that a punitive-damages award was excessive or palpably wrong, it should be upheld, relying upon Gold Kist, Inc. v. Hood, 773 So.2d 1031, 1036
(Ala.Civ.App. 1999) ("`[A] judgment based on a jury verdict awarding punitive damages will be affirmed, in the absence of evidence that the verdict was "plainly and palpably wrong and unjust."' Lozier Corp. v. Gray, 624 So.2d 1034, 1037 (Ala. 1993), citing King Motor Co. v. Wilson, 612 So.2d 1153, 1156
(Ala. 1992).").
This Court reviews an award of punitive damages de novo.Acceptance Ins. Co. v. Brown, 832 So.2d 1 (Ala. 2001). See alsoCooper Indus., Inc. v. Leatherman Tool Group, Inc.,532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). Retaliatory discharge has been condemned by the Legislature. The statutory scheme of allowing an employee to recover damages from an employer who discharges him solely because he filed a workers' compensation claim does not contemplate a negligent retaliatory discharge — it deals exclusively with an intentional tort. The jury in this case found that Flint violated Alabama's public policy against discharging employees who seek benefits pursuant to Alabama's Workers' Compensation Act. Nevertheless, whether to award punitive damages was discretionary with the jury, and it chose to award them. Accepting Hall's view of the evidence, as we are required to do when reviewing a jury verdict at the request of the movant, Waddell Reed, Inc., supra, Flint's conduct is sufficiently reprehensible to support an award of punitive damages. As to the question whether that award is excessive, we have previously held that a single-digit multiplier of punitive damages to compensatory damages is constitutionally permitted in most instances. Orkin Exterminating Co. v. Jeter, 832 So.2d 25
(Ala. 2001). Here, where the jury awarded $200,000 in punitive damages and $400,000 in compensatory damages, a ratio of 0.5:1, we conclude that the jury's punitive-damages award is not excessive. Therefore, we affirm the judgment insofar as it awards $200,000 in punitive damages.
Flint also argues that the award of punitive damages is due to be reversed on the authority of *Page 255 State Farm Mutual Automobile Insurance Co. v. Campbell,538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), which Flint, in its brief, says stands for the proposition that "the courts of one State are without power to punish a defendant for conduct which occurs in other States, particularly where, as here, the conduct complained of is not illegal in the state in which it is committed." We do not address this argument because, as we have previously discussed, by having agreed and represented to the trial court that it was "subject to the provisions of the [Workers'] Compensation Act of Alabama, as amended," in providing benefits to Hall, Flint is estopped from claiming that its retaliatory discharge of Hall was not illegal in Alabama because the conduct was not illegal under Georgia law. See Ex parteFirst Alabama Bank, supra, 883 So.2d at 1244-45, embracing NewHampshire v. Maine, 532 U.S. 742, 121 S.Ct. 1808,149 L.Ed.2d 968 (2001), which held:
 "[F]or judicial estoppel to apply (1) `a party's later position must be "clearly inconsistent" with its earlier position'; (2) the party must have been successful in the prior proceeding so that `judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or second court was misled"' (quoting Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 599 (6th Cir. 1982)); and (3) the party seeking to assert an inconsistent position must `derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'"
532 U.S. at 750-51, 121 S.Ct. 1808. These factors are applicable to this proceeding.
 V. Conclusion
For the foregoing reasons, we affirm the judgment entered on the jury's verdict in this case.
AFFIRMED.
HOUSTON, BROWN, JOHNSTONE, HARWOOD, WOODALL, and STUART, JJ., concur.
NABERS, C.J., concurs in the result.
SEE, J., dissents.
[1] Flint states in its brief at p. 13 n. 4:
 "Hall claims that his daughter sometimes borrowed his players' card to gamble during this period and drove to the casino from the family home in Alabama, but his wife testified that [the daughter] was only 15 years old at the time."
The record reflects that Mrs. Hall testified on direct examination that she and Hall had seven children and on cross-examination that the Halls' youngest child would have been 15 in 1997. However, the reference in the record relied upon by Flint in its brief for the foregoing quoted statement does not establish that the 15-year-old child was the daughter who borrowed the card.
[2] If Hall were subject to the Georgia Workers' Compensation Act, he would not have a cause of action, because Georgia does not recognize a remedy for retaliatory discharge. See ScottBridge Co. v. Wright, 883 So.2d 1221 (Ala. 2003), discussing Georgia law.
[3] In his dissent, Justice See concludes: "However, the main opinion is allowing the satisfaction of Hall's burden to respond to Flint's proffered legitimate reason for discharging Hall to satisfy Hall's initial obligation to show a causal connection between Hall's injury and workers' compensation claim and the termination of his employment." 904 So.2d at 257 (emphasis added). Assuming, arguendo, that the dissent is correct in its conclusion that Hall's prima facie case is insufficient in the context of Hall's satisfaction of his initial obligation at the close of his evidence to demonstrate causality between the injury, the claim, and the termination, such circumstance does not preclude our review of the entire record to determine whether Hall satisfied his obligation to establish a prima facie case. See Alabama Power Co. v. Aldridge, 854 So.2d 554, 560-61 (Ala. 2002) ("The trial court denied APCo's motion for a JML at the close of Aldridge's evidence and again at the conclusion of all of the evidence. It is unnecessary to review the record as it stood at the time APCo moved for a JML at the close of Aldridge's evidence because, even assuming the motion was erroneously denied at that time, we review the record as of the time the motion for a JML was renewed at the close of all the evidence."). Viewing the entire record, Flint's internally inconsistent evidence as to why it discharged Hall was sufficient to allow the jury to conclude that the competing reason tendered by Hall must be true. As such, Hall's contention is not merely an ipse dixit, i.e., an assertion made but not proved.