4 So.3d 472 (2008)
Ex parte A.M.B.
(In re A.M.B. v. R.B.B. and P.B.)
1061455.
Supreme Court of Alabama.
September 5, 2008.
*473 Brenda L. Harrell and N. Katherine Pritchett of Legal Services Alabama, Inc., Birmingham, for petitioner.
Elizabeth S. Parsons of Blair & Parsons, P.C., Pell City, for respondents.
MURDOCK, Justice.
We granted A.M.B.'s petition for a writ of certiorari to review the Court of Civil Appeals' affirmance of a May 2006 judgment entered by the St. Clair Juvenile Court. See A.M.B. v. R.B.B., 4 So.3d 468 (Ala.Civ.App.2007). The May 2006 judgment declared that A.M.B. was an unfit parent, and it awarded custody of A.M.B.'s daughter, H.S.B., to R.B.B. and P.B. ("the paternal grandparents"). We now quash the writ, noting that this case involved ore tenus proceedings and that the following summary reflects those factual findings the trial court made or could have made in support of its judgment. See Transamerica Commercial Fin. Corp. v. AmSouth Bank, 608 So.2d 375, 378 (Ala.1992); see also Ex parte Patronas, 693 So.2d 473, 475 (Ala.1997) ("`Neither the Court of Civil Appeals nor this Court is allowed to reweigh the evidence in this case. This case, like all disputed custody cases, turns on the trial court's perception of the evidence. The trial court is in the better position to evaluate the credibility of the witnesses ... and the trial court is in the better position to consider all of the evidence, as well as the many inferences that may be drawn from that evidence, and to decide the issue of custody.").[1]

Facts and Procedural History
The record supports the facts that follow. A.M.B., who was born in June 1986, gave birth to H.S.B. in March 2003. K.S.B., who was born in April 1979, is the father of H.S.B. K.S.B. and A.M.B. have never been married; they have had an "on-again-off-again" relationship.
A.M.B. dropped out of school when she was in the 10th grade. She was employed at a McDonald's fast-food restaurant when H.S.B. was born, but she was unemployed for most of the time between H.S.B.'s birth and the March 2006 trial in the present case.[2]
After H.S.B.'s birth, A.M.B. and H.S.B. resided at various times with A.M.B.'s mother, A.M.B.'s sister, and the paternal grandparents. In the fall of 2004, A.M.B. requested that the paternal grandfather adopt H.S.B. "or she would find somebody that would." (According to the paternal grandfather, it was the third adoption request A.M.B. had made to him.) In November 2004, the paternal grandparents filed an adoption petition in the St. Clair Probate Court. Along with their petition, the paternal grandparents submitted a notarized "Consent of Minor for Adoption" that had been executed by A.M.B. and a similar consent that had been executed by *474 K.S.B.; the consents were dated October 29, 2004.[3]
After the paternal grandparents filed their adoption petition, the probate court entered an interlocutory judgment of adoption. Because the paternal grandparents were related to H.S.B., the court concluded that no pre-placement investigation was necessary, see Ala.Code 1975, § 26-10A-28, and it "grant[ed] custody of [H.S.B.] to [the paternal grandparents,]... hereby confer[ring] the responsibility of the maintenance and support of the adoptee." The probate court set the matter for a "dispositional hearing" to be held on January 18, 2005. See Ala.Code 1975, § 26-10A-25.
In November 2004, after the entry of the interlocutory judgment, A.M.B. was arrested for disorderly conduct at the paternal grandparents' home after a dispute between her and K.S.B. concerning H.S.B.[4] A.M.B. was taken to jail and was subsequently released.
On January 16, 2005, K.S.B. apparently forcefully removed A.M.B. from a friend's home, violently beat her, and left her unconscious in an abandoned mobile home. A.M.B. subsequently was taken to the hospital, where she remained until February 28, 2005, when she was discharged for outpatient physical therapy.[5] K.S.B. was arrested and placed in jail; he remained in jail until August 2005, when he was released *475 pending a criminal trial on charges of kidnapping and attempted murder resulting from the incident involving A.M.B. Despite K.S.B.'s attack on A.M.B., she and K.S.B. continued their "on-again-off-again" relationship after his release from jail in August 2005. In fact, A.M.B. admitted that she asked that the charges against K.S.B. be dropped.[6] Also, according to the paternal grandmother, A.M.B. requested that K.S.B. stay with her while she was visiting with H.S.B.
The probate court conducted the scheduled dispositional hearing in January 2005. Before the hearing, the paternal grandparents informed their attorney that A.M.B. was in the hospital. According to the paternal grandparents' attorney, he did not convey that information to the probate court because A.M.B. had already consented to the adoption and had waived further notice of the adoption proceedings. After the January 18, 2005, hearing, the probate court entered a final judgment, granting the paternal grandparents' petition to adopt H.S.B.
According to A.M.B., while she was in the hospital recovering from the beating by K.S.B., she "discovered" that the paternal grandparents had adopted H.S.B. While she was in the hospital, A.M.B. also met with an attorney concerning the adoption. It is undisputed that after her release from the hospital, A.M.B. did not contact the paternal grandparents concerning H.S.B. or attempt to visit her for several months.[7]
In July 2005, A.M.B. filed a motion to set aside the January 2005 judgment of adoption on the ground that she had not consented to H.S.B.'s adoption, see note 3, supra, and on the ground that the probate court failed to appoint a guardian ad litem to represent A.M.B., who was a minor in January 2005. See Ala.Code 1975, § 26-10A-8(a) ("Prior to a minor parent giving consent a guardian ad litem must be appointed to represent the interests of a minor parent whose consent is required."). A.M.B. argued that the January 2005 judgment of adoption was void. The paternal grandparents opposed A.M.B.'s petition.
In September 2005, at the request of the paternal grandparents, the St. Clair Probate Court transferred the case to the St. Clair Juvenile Court. Upon receipt of the case, the juvenile court appointed a guardian ad litem to represent H.S.B.'s interests; no guardian ad litem was appointed for A.M.B., who was by then no longer a minor and had retained counsel.
The paternal grandparents allowed A.M.B. to visit with H.S.B. during the pendency of the juvenile court proceedings, and the evidence would support a finding that, contrary to A.M.B.'s assertions, the paternal grandparents did not attempt to keep her from visiting H.S.B. In September 2005, upon A.M.B.'s request, *476 the paternal grandparents agreed to a regular visitation schedule. Thereafter, however, according to the paternal grandfather, "[a] lot of times" A.M.B. did not attend the scheduled visitation.
In December 2005, A.M.B. was arrested and charged with domestic violence based on an incident involving her sister that occurred in the presence of the sister's young children. Specifically, A.M.B. was charged with harassment under Ala.Code 1975, § 13A-11-8(a)(1)a, a Class-C misdemeanor ("A person commits the crime of harassment if, with intent to harass, annoy, or alarm another person, he or she... [s]trikes, shoves, kicks, or otherwise touches a person or subjects him or her to physical contact."). A.M.B. pleaded guilty to the charge. She was sentenced to 60 days in jail. That sentence was suspended, and she was placed on probation for 12 months; she was also fined $500.
In March 2006, the juvenile court conducted an ore tenus proceeding. The paternal grandparents took the position at the proceeding that the adoption should not be set aside, but that if it was set aside, they should be awarded custody of H.S.B. In April 2006, before the juvenile court entered its judgment, the paternal grandparents also filed a petition alleging that H.S.B. was a dependent child "in that the natural mother and natural father are unable to provide the proper food, clothing, shelter, and parental care and control necessary for the well being of [H.S.B.]."[8] The petition was filed under the same case number as the proceeding initiated by A.M.B. to set aside H.S.B.'s adoption. A.M.B. filed a motion to dismiss the paternal grandparents' dependency petition, arguing, in part, that the issues "brought before the Court ... are encompassed in the issues pending before the Court and currently under the Court's advisement in the adoption case." The juvenile court set the dependency petition for a hearing. It is unclear, however, whether a hearing was ever held on the petition.
Thereafter, on May 26, 2006, the juvenile court entered a judgment acknowledging that the paternal grandparents had filed a dependency petition, but stating that "all matters involving custody of the minor [could] be determined in the original proceeding." The juvenile court determined that A.M.B.'s consent to the adoption was invalid, and it dismissed the paternal grandparents' adoption petition. The court then proceeded to declare that A.M.B. and K.S.B. were unfit parents, and it awarded custody of H.S.B. to the paternal grandparents, subject to A.M.B.'s right to "supervised visitation with the minor child at all reasonable times and places as shall be agreed to by [A.M.B.] and [the paternal grandparents]." The order also required that K.S.B., who was living with the paternal grandparents pending his trial on criminal charges arising out of his beating of A.M.B., "shall not reside nor have overnight visits with [H.S.B.], and his visitation with [H.S.B.] shall be supervised by the [paternal grandparents]." We note that, at trial, the paternal grandparents stated that they would require K.S.B. to move from their home if the juvenile court believed that that would be appropriate.
A.M.B. filed a postjudgment motion, which was denied by operation of law. She then appealed to the Court of Civil Appeals, arguing that the juvenile court erred in finding her to be an unfit parent and, alternatively, that, even if custody remained with the paternal grandparents, it erred in failing to set out a visitation *477 schedule. The Court of Civil Appeals affirmed the juvenile court's judgment as to custody, specifically noting that the evidence supported the juvenile court's custody award under the standard announced in Ex parte Terry, 494 So.2d 628, 632 (Ala. 1986). A.M.B., 4 So.3d at 470. The Court of Civil Appeals reversed the judgment as to visitation because the juvenile court failed "to set forth a specific visitation schedule so as to provide for reasonable contact between [A.M.B.] and [H.S.B.]." 4 So.3d at 472. A.M.B. filed a petition for a writ of certiorari as to the custody issue, which we granted.

Discussion of the Merits
A.M.B. contends that the juvenile court's custody award is not supported by clear and convincing evidence of her unfitness as a parent as required by Ex parte Terry, supra. As to custody disputes between a parent and a nonparent, this Court, in Ex parte Terry, adopted the standard announced in Ex parte Berryhill, 410 So.2d 416, 417 (Ala.1982), requiring "clear and convincing evidence that the natural [parent] is either unfit or unsuited for the role of [parent]." This Court further stated in Ex parte Terry that the right of a natural parent to the custody of his or her child, as against the right to custody of a nonparent, is
"`grounded in the common law concept that the primary parental right of custody is in the best interest and welfare of the child as a matter of law. So strong is this presumption, absent a showing of voluntary forfeiture of that right, that it can be overcome only by a finding, supported by competent evidence, that the parent seeking custody is guilty of such misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question.'"
494 So.2d at 632 (quoting Ex parte Mathews, 428 So.2d 58, 59 (Ala.1983)) (some emphasis omitted; emphasis added).
Citing various precedents that apply the Terry standard, the mother argues that the factors relied upon by the Court of Civil Appeals (specifically, she notes the evidence concerning her changes in residence,[9] her reliance upon family members for support, her inconsistent work history, the December 2005 domestic-violence charge filed against her by her sister,[10] her temper, her smoking habits, and her immature behavior) did not "afford an adequate basis for favoring a non-parent over a parent" for custody purposes. She concludes that the paternal grandparents "failed to present any evidence that [A.M.B.] either engaged in any misconduct concerning [H.S.B.] or neglected her in any way." To say that A.M.B.'s conclusion in this regard is an overstatement would be an understatement.
We agree with A.M.B. that, in the abstract and in a given case, no one factor *478 she notes or no combination of the factors she notes might be sufficient to support a determination of parental unfitness. For example, in the abstract, a parent's reliance on others, particularly family, for support is not, in and of itself, determinative of the parent's unfitness. Indeed, in a particular case such reliance may indicate a level of maturity and resourcefulness that is designed to further the best interest of the child or children whose custody is at issue. Likewise, demonstrations of immaturity, or selfish decision-making, may not, in a particular case, be sufficient to support a finding of unfitness. Based on the conflicting evidence presented to the juvenile court in the present case, however, and the ample evidence that lends itself to the conclusion that A.M.B.'s testimony was not credible in many respects and was disbelieved by the juvenile court, such considerations avail A.M.B. nothing. In addition to the other deficiencies in her behavior that are reflected in the record and discussed above, we particularly note the evidence concerning A.M.B.'s lack of effort to visit with her child after A.M.B. left the hospital in February 2005 and her numerous failures to attend scheduled visitation after she filed the petition to set aside the adoption. See Ex parte J.W.B., 933 So.2d 1081, 1092 (Ala.2005) ("`We should not equate the filing of "court papers" and the taking of legal positions with the establishment of human relationships.'"), reversing K.W.J. v. J.W.B., 933 So.2d 1075 (Ala.Civ.App.2005).
After carefully reviewing the record, and in light of the presumption that attends a trial court's judgment in ore tenus proceedings, we cannot conclude that the juvenile court's judgment in the present case is unsupported by clear and convincing evidence of unfitness. Accordingly, we quash the writ.
WRIT QUASHED.
COBB, C.J., and SEE, LYONS, WOODALL, STUART, SMITH, and PARKER, JJ., concur.
BOLIN, J., dissents.
NOTES
[1] In her brief, A.M.B. presents a compelling version of the facts in support of her arguments. A review of the record, however, reveals that A.M.B.'s representation of the facts does not accurately reflect the totality of the evidence presented to the juvenile court.
[2] Between the date of H.S.B.'s birth and the date of the trial, A.M.B. worked at a Piggly Wiggly grocery store for "a month or two," and she babysat one summer. A.M.B. began working as a cashier at two grocery stores two or three months before the trial.
[3] A.M.B. alleged that the signature on her consent form was forged, and she testified that she had not met with the attorney who prepared the adoption petition and consent form or the notary public who allegedly notarized her signature. However, Linda C. Venable, the notary public who notarized A.M.B.'s signature, and Jimmy Ray Calvert, the attorney who prepared and filed the adoption petition and A.M.B.'s consent form, testified that A.M.B. executed the consent form in Calvert's office after Calvert had discussed the adoption with A.M.B. Because the foregoing conflicting evidence was presented in an ore tenus proceeding, we must conclude that the trial court rejected A.M.B.'s testimony. See Transamerica, supra; see also Flint Constr. Co. v. Hall, 904 So.2d 236, 250 (Ala.2004) ("It is axiomatic that it is the [fact-finder's] province to resolve conflicts in testimony ... and to judge the credibility of witnesses. ... [A fact-finder] concluding that any witness was willfully not truthful about one material aspect of his or her testimony is free to disregard all or any part of the testimony." (citations omitted)). We also note that A.M.B.'s mother and her sister attempted to corroborate various aspects of A.M.B.'s testimony concerning the consent (either as to its execution or as to when A.M.B. became aware of the adoption proceeding), which testimony likewise placed doubt upon their credibility.
[4] According to A.M.B., the dispute occurred because she wanted to take H.S.B. with her, but K.S.B. refused to allow her to do so. We note that A.M.B. later gave conflicting testimony concerning where H.S.B. resided between the date of her arrest in November 2004 and the January 2005 dispositional hearing. On the one hand, she testified that H.S.B. resided with her between November 2004 and January 2005; on the other hand, she testified that she visited H.S.B. "maybe twice a week" at the paternal grandparents' home during that same period.
[5] A.M.B. suffered serious injuries that required surgery and extended rehabilitation. At trial, however, her testimony concerning the extent of her injuries was inconsistent with her medical records. For example, A.M.B. testified that she was unconscious for a month after the incident, but her medical records reflect that she was responsive to the medical staff within a few days after her admission to the hospital on January 16, 2005.

We also note that A.M.B. apparently had a "bad temper," and that, while in rehabilitation, she displayed immature behavior. The hospital discharge summary states that during A.M.B.'s stay at the rehabilitation facility she "consistently behav[ed] childlike. ... She ... refused medication. [A.M.B.] tend[ed] to throw tantrum[s] at times in both floor as well as therapies. She smoked in her room on the day prior to discharge and required confiscation by the nursing staff of her lighter and cigarette."
[6] A.M.B. explained this by stating that the paternal grandparents told her that they would not let her visit with H.S.B. unless she asked that the charges be dropped. She admitted, however, that the paternal grandparents were already allowing her to visit with H.S.B. at the time.
[7] A.M.B. admitted that she did not see H.S.B. in February, March, April, or May 2005. She stated that she did not attempt to visit with H.S.B. because she was afraid of the paternal grandparents. She later admitted, however, that the paternal grandparents had never threatened her. Also, K.S.B.'s presence was not an issue during that period because he was in jail until August 2005. It appears that the juvenile court disregarded A.M.B.'s testimony concerning the reason she failed to attempt to visit with A.M.B. We note that A.M.B.'s testimony as to her alleged fear of the paternal grandparents is inconsistent with other testimony concerning her relationship with the paternal grandparents and their amenability to her visitation with H.S.B.
[8] Although the paternal grandparents made an allegation of dependency, the Department of Human Resources did not participate in the proceeding, and no attempt appears to have been made to require the Department's involvement.
[9] A.M.B. testified that she intended for her and H.S.B. to reside with her mother if she was awarded custody. A.M.B. admitted, however, that she had repeatedly moved out of her mother's home and her sister's home because she fought with them.
[10] It is not clear from the record whether the juvenile court considered the custody presumptions that apply in cases involving incidents of "domestic of family abuse." Ala. Code 1975, § 30-3-130 et seq. Harassment (§ 13A-11-8) is one of the crimes that may give rise to "a rebuttable presumption by the court that it is detrimental to the child and not in the best interest of the child to be placed in sole custody, joint legal custody, or joint physical custody with the perpetrator of domestic or family violence." Ala.Code 1975, § 30-3-131. A court must also consider, however, "what, if any, impact the domestic violence had on the child." Id.