989 So.2d 1025 (2007)
BLUE CIRCLE CEMENT INC. and Lafarge Building Materials Inc.
v.
Sidney Wayne PHILLIPS.
1060564.
Supreme Court of Alabama.
November 30, 2007.
Rehearing Denied February 22, 2008.
*1026 Robert A. Huffaker and T. Kent Garrett of Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, for appellants.
Lawrence T. King and Lindsey O. Hill of King & Horsley, Birmingham; and Darrell L. Scarlett of Cope, Hudson, Scarlett, Reed & McCreary, Murfreesboro, Tennessee, for appellee.
STUART, Justice.
Sidney Wayne Phillips sued Blue Circle Cement Inc. and Lafarge Building Materials Inc. (hereinafter collectively referred to as "Blue Circle") in the Chambers Circuit Court alleging that his employment had been terminated in retaliation for filing a claim for workers' compensation benefits.[1] After a trial, the jury returned a verdict in favor of Phillips, awarding $200,000 in compensatory damages and $2,000,000 in punitive damages. In postjudgment proceedings, the trial court reduced the punitive-damages award to $600,000 and entered an $800,000 judgment in favor of Phillips. We reverse and remand.

I.
At all times relevant to this action, Blue Circle operated various cement plants in southeast Alabama and southwest Georgia, including Auburn, Lanett, Phenix City, and Eufaula, Alabama, as well as LaGrange, Georgia. In April 2000, Blue Circle hired Phillips, a resident of Valley, Alabama, to work as a truck driver based out of the Lanett plant. Phillips was responsible for loading his truck with cement each day and then delivering the load to job sites in Alabama and Georgia. At some time after he was hired, Phillips's assignment was changed from the Lanett plant to the LaGrange plant, although he apparently continued to sometimes be dispatched from the Lanett plant and to make deliveries in both Alabama and Georgia.
On June 20, 2001, Phillips loaded his truck at the Lanett plant and was dispatched to a job site in Georgia. While Phillips was driving his truck north on Interstate 85 in Georgia, a tire failed and *1027 the truck overturned, rolling into the median. Phillips was transported from the accident site by helicopter to Columbus Regional Medical Center in Columbus, Georgia, where he was hospitalized overnight. The next day, he was released from the hospital with a diagnosis of a back strain.
Phillips was subsequently treated for back pain by Dr. J.G. Stauffer, an orthopedist with the Hughston Clinic. He also received physical therapy. On June 25, 2001, Dr. Stauffer cleared Phillips for light-duty work, but not for driving. After Phillips complained of sleeplessness and anxiety because of the accident, he also received counseling from Dr. Steve Brown, a counselor who visited Phillips's home on June 29, 2001, and concluded that he was suffering from post-traumatic stress disorder ("PTSD"). All of these services were paid for by Blue Circle.
On Monday, July 23, 2001, Dr. Stauffer cleared Phillips to return to work without any restrictions. Dr. Stauffer noted in his report that "[t]he patient states that he is feeling better" and "[h]e wants to go back to full duty." On July 24-26, Phillips reported to work and rode with another driver so that he could, in his words, "try to work out the fear of driving by myself." Phillips testified that during these rides he became anxious and had flashbacks of the accident; however, after returning to the plant on the afternoon of July 26 he nevertheless agreed to try driving by himself the next day "to keep [his supervisors] from pushing the issue and making a big deal out of it."
On Friday, July 27, Phillips reported to work at the LaGrange plant and was dispatched to pick up a load of cement at the Lanett plant and to deliver it to Beulah Elementary School in Valley. Phillips completed the 100-mile round trip, during which he drove by the location of his accident, without incident; however, he testified that the trip "bothered" and "upset" him. Immediately upon returning to the LaGrange plant, Phillips approached Darrell Matthews, the dispatcher, and told him that he felt that he was unable to drive the truck safely. Matthews then telephoned their supervisor, Keith Dukes, who was at the Auburn plant and who traveled to LaGrange to meet with Phillips that same day. When Dukes arrived, Phillips testified that he told him the same thing he had told Matthews: "I said, `Keith, I feel like I'm unable to drive a truck at this time, I feel like I need more time to get over my fear of driving and I need more counseling....'" At Dukes's request, Phillips also handwrote a statement to that same effect, which read:
"I[,] S.W. Phillips[,] feel like that I am not ready to drive at this time and there is no doubt that I need some counseling to help me get over the accident that happened on 6-20-01. Every time I get in the truck I keep seeing the accident."
Dukes then told Phillips to take the rest of the day off and that he would contact him the following week. Dukes then wrote a memorandum memorializing the conversation; that memorandum reads as follows:
"Sidney says he is uncomfortable driving a truck, keeps seeing wreck over when driving and basically scared to drive the truck. Sidney says he can't tell when he would be able to drive again. He would need counseling to get over accident.
"I told Sidney I was going to give him the rest of the day off. Harold Kee[2] would be back Monday. I would talk to him and Pat Kerce[3] to find out what jobs were available."
*1028 The memorandum was signed by Dukes, Matthews, and another Blue Circle employee who witnessed the meeting, and Phillips agreed at trial that the memorandum accurately represented their conversation.
Subsequently, various Blue Circle officials had conversations regarding Phillips's situation. Those officials included Dukes; Pat Kerce, a human-resources manager; Harold Kee, general manager for the western Georgia area; John Richardson, vice president of human resources; and John Swierenga, a safety director with responsibility over workers' compensation claims. A decision was ultimately made to give Phillips the choice of either returning to driving a truck or having his employment terminated, and Dukes was instructed to give Phillips this ultimatum when he returned to work.
On July 31, Dukes telephoned Phillips and asked Phillips to meet him at the Lanett plant. At that meeting, Dukes gave Phillips the ultimatum of either driving a truck or having his employment terminated, and, after Phillips again indicated that he was unwilling to resume driving a truck at that time, Dukes informed Phillips that his employment was being terminated.
On January 28, 2002, Phillips sued Blue Circle, alleging that, in terminating his employment, Blue Circle had violated § 25-5-11.1, Ala.Code 1975, which provides:
"No employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits under this chapter...."
The case was tried before a jury in September 2006. Blue Circle moved for a judgment as a matter of law at the close of Phillips's evidence and again at the close of all the evidence; the trial court denied those motions. The jury ultimately returned a verdict in favor of Phillips, awarding him $200,000 in compensatory damages and $2,000,000 in punitive damages.
Blue Circle filed various postjudgment motions: a motion for a judgment as a matter of law; a motion to alter, amend, or vacate the judgment; a motion for a new trial; a motion for remittitur; and a motion to reduce the judgment pursuant to § 6-11-21(a), Ala.Code 1975, which provides that in such cases "no award of punitive damages shall exceed three times the compensatory damages of the party claiming punitive damages or five hundred thousand dollars ($500,000), whichever is greater." The trial court subsequently reduced the punitive-damages award to $600,000 in compliance with § 6-11-21; however, it denied Blue Circle's postjudgment motions in all other respects and entered a judgment against Blue Circle and in favor of Phillips in the amount of $800,000. Phillips then moved the trial court to vacate its order reducing the punitive-damages award, on the ground that § 6-11-21 was unconstitutional; however, the trial court denied his motion. Blue Circle appeals.

II.
Blue Circle makes five arguments on appeal, two concerning the verdict and three relating to the damages award. First, Blue Circle argues that Phillips has not stated a viable claim of retaliatory discharge because, it argues, § 25-5-11.1 is applicable only if "the employee has instituted or maintained any action against the employer to recover workers' compensation benefits under this chapter," and, Blue Circle claims, Phillips never stated a claim for benefits under Alabama law; rather, any claim for workers' compensation benefits was processed and paid under *1029 Georgia law. Second, Blue Circle argues, a discharged employee may recover under § 25-5-11.1 only if his employment was terminated solely because he had made a claim for worker's compensation benefits and, Blue Circle argues, Phillips failed to present substantial evidence of that fact. As to the damages claims, Blue Circle first argues that the compensatory-damages award is excessive and should be remitted and that there is no basis to support a punitive-damages award. In the event this Court finds there was a basis for an award of punitive damages, Blue Circle then argues that those damages should be remitted. Because we agree that Blue Circle was entitled to a judgment as a matter of law on its argument that Phillips failed to present substantial evidence indicating that his employment was terminated solely because he had made a claim for worker's compensation benefits, we consider only that argument and pretermit discussion of the remaining issues raised by Blue Circle.
In Webb Wheel Products, Inc. v. Hanvey, 922 So.2d 865, 870 (Ala.2005), this Court explained the standard of review applicable to a trial court's ruling on a motion for a judgment as a matter of law:
"This Court applies the same standard of review to a ruling on a motion for a [judgment as a matter of law] as the trial court used in initially deciding the motion. This standard is `materially indistinguishable from the standard by which we review a summary judgment.' Hathcock v. Wood, 815 So.2d 502, 506 (Ala.2001). We must decide whether substantial evidence was presented to the jury, which, when viewed in the light most favorable to [the nonmovant], would warrant a jury verdict in his favor. City of Birmingham v. Sutherland, 834 So.2d 755 (Ala.2002). `Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). Furthermore, `we review the record as of the time the motion for a [judgment as a matter of law] was renewed at the close of all the evidence.' Alabama Power Co. v. Aldridge, 854 So.2d 554, 561 (Ala. 2002)."

III.
This Court has articulated the following test for determining whether a plaintiff may recover under § 25-5-11.1:
"In order for an employee to establish a prima facie case of retaliatory discharge the employee must show: 1) an employment relationship, 2) an on-the-job injury, 3) knowledge on the part of the employer of the on-the-job injury, and 4) subsequent termination of employment based solely upon the employee's on-the-job injury and the filing of a workers' compensation claim."
Alabama Power Co. v. Aldridge, 854 So.2d 554, 563 (Ala.2002). It is undisputed that Phillips proved the first three elements: that he was employed by Blue Circle; that he injured his back when the cement truck he was driving in the course of his employment rolled over; and that all the Blue Circle officials involved in the discussions leading to his discharge knew about his on-the-job injury. The parties dispute whether Phillips proved the fourth element  that the termination of his employment was based solely on his injury and his having filed a worker's compensation claim. Even assuming that Phillips established a prima facie case of retaliatory discharge, the burden would then have shifted to Blue Circle to present a legitimate reason for the termination of his *1030 employment, and Phillips would then have the burden of showing that the proffered legitimate reason was pretextual. Flint Constr. Co. v. Hall, 904 So.2d 236, 250 (Ala.2004). Blue Circle met its burden and presented evidence that there was a legitimate reason for Phillips's discharge; however, Phillips did not meet his burden of going forward with rebuttal evidence showing that Blue Circle's stated reason was pretextual. Thus, whether Phillips in fact established a prima facie case is immaterial because, regardless of whether Phillips established a prima facie case, Blue Circle is entitled to a judgment as a matter of law.
In Aldridge, this Court clarified the requirement that, in order to prevail in an action instituted pursuant to § 25-5-11.1, a plaintiff must put forth substantial evidence indicating that a claim for worker's compensation benefits was the sole reason for the termination of the plaintiff's employment. We described the circumstances in which a conclusive determination could be made that retaliation is not the sole cause, which determination would entitle the employer to a judgment as a matter of law:
"The clear import of our holding in Norfolk Southern [Ry. v. Johnson, 740 So.2d 392 (Ala.1999),] is that where a conclusive determination can be made that retaliation is not the sole basis for the discharge a judgment as a matter of law is appropriate. A plaintiff, therefore, has the burden of presenting sufficient evidence indicating that the plaintiff was discharged because he or she filed a claim for workers' compensation benefits, but if there is uncontradicted evidence of an independently sufficient basis for the discharge then the defendant is entitled to a judgment as a matter of law. Such a holding is comparable to the rule prevailing in Indiana under a similar statute. See Dale [v. J.G. Bowers, Inc.,] 709 N.E.2d [366,] 369 [(Ind.Ct.App.1999)] (`"the word `solely'... [is] used to mean without an independent lawful reason which would justify the otherwise unlawful action"'). An employer's stated basis for a discharge is sufficient as a matter of law when the underlying facts surrounding the stated basis for the discharge are undisputed and there is no substantial evidence indicating (a) that the stated basis has been applied in a discriminatory manner to employees who have filed workers' compensation claims, (b) that the stated basis conflicts with express company policy on grounds for discharge, or (c) that the employer has disavowed the stated reason or has otherwise acknowledged its pretextual status.

"If such undisputed evidence is admitted as a part of the plaintiff's case, then the defendant who so moves is entitled to a judgment as a matter of law at that point. If such evidence is established during the defendant's presentation and the plaintiff cannot thereafter rebut it, then the defendant's renewed motion for a judgment as a matter of law at the close of all of the evidence is due to be granted. Whether the plaintiff's prima facie evidence is strong and the defendant's evidence is weak or equivocal and therefore subject to disbelief by a jury, as recognized in Culbreth [v. Woodham Plumbing Co., 599 So.2d 1120 (Ala. 1992)], must be determined on a case-by-case basis."
854 So.2d at 568 (some emphasis in original; some emphasis added). Blue Circle argues that it presented "uncontradicted evidence of an independently sufficient basis for the discharge"  that Phillips would not resume driving a cement truck when directed to do so  and that it was accordingly entitled to a judgment as a matter of law. We agree.
*1031 The essential facts surrounding Blue Circle's stated basis for terminating Phillips's employment are undisputed. On June 20, 2001, Phillips was injured in an accident while driving a cement truck as part of his job. On July 23, 2001, Phillips's doctor cleared him to return to work without any restrictions. On July 27, 2001, Phillips reported to Dukes, his supervisor, that he was not ready to drive a cement truck "at this time" and that he did not know when he would be able to drive again. Dukes forwarded that information to Blue Circle officials who, after discussion, directed Dukes to give Phillips an ultimatum  either return immediately to driving a cement truck or have his employment terminated. Phillips would not resume driving, and, as warned, his employment was terminated.
Because these facts are undisputed, Blue Circle's stated reason for terminating Phillips's employment is sufficient as a matter of law unless there is substantial evidence indicating: (1) "that the stated basis has been applied in a discriminatory manner to employees who have filed workers' compensation claims"; (2) "that the stated basis conflicts with express company policy on grounds for discharge"; or (3) "that [Blue Circle] has disavowed the stated reason or has otherwise acknowledged its pretextual status." Aldridge, 854 So.2d at 568. There is no such evidence.
Blue Circle's stated basis for terminating Phillips's employment was that he would not drive a cement truck when he was ordered to do so on the day of his discharge. The record contains no evidence indicating that Blue Circle fired any other workers  whether they had filed workers' compensation claims or not  for that same reason. Thus, this first factor has no bearing on whether Blue Circle's stated reason for terminating Phillips's employment was sufficient as a matter of law.
We next consider whether Blue Circle's position that Phillips's employment was terminated because he would not drive a truck at the time of his discharge conflicts with the company's stated policy on grounds for discharge. The Blue Circle employee handbook makes the following statement in the section entitled "Discipline":
"For these following violations a driver may not receive warning but may be immediately dismissed. This list is not inclusive and other violations exist for disciplinary action or immediate discharge:
"....
"Refusing to load or work."
Phillips testified at trial that when he told Matthews, the dispatcher, that he was "unable" to drive a truck, he did not state that he was "refusing" to drive a truck because, Phillips stated, "I was already told months before that if you refused to drive a truck or haul a load to any job site, that's automatic termination."[4] Thus, not only was *1032 Blue Circle's policy providing for the immediate discharge of employees who refused to work expressly stated, but Phillips also acknowledged at trial that he was aware of that policy. Blue Circle's decision to fire Phillips because he would not drive a truck when requested was consistent with the company's stated policy as expressed in its employee handbook.
Finally, we must consider whether there was substantial evidence indicating that Blue Circle disavowed the given reason for Phillips's discharge or in some other way acknowledged that that reason was pretextual. Blue Circle's stated basis for terminating Phillips's employment was that he would not drive a cement truck when directed to do so on the date of his discharge, even though he was warned that if he did not agree to drive the truck his employment would be terminated. This is, in fact, the reason Phillips was told his employment was being terminated at the meeting during which he was discharged. Under questioning by Blue Circle at trial, Dukes described that meeting as follows:
"Q: Let me ask you something. Did you want to fire Sidney or did you want Sidney to keep driving a truck for you?
"A: No. The day that the termination [became] effective, I hoped that he would get back in that truck and go back to work.
"Q: Let's go to that. Let me ask you about the day the termination took place. Did you have a conversation with Sidney on the last day that he worked for Blue Circle?
"A: Yes, sir.
"Q: Tell us about that meeting, what you said to him and what he said to you.
"A: The last day?
"Q: Yes, sir.
"A: I met him in our Lanett, Alabama, facility and I basically told Sidney  I had a witness with me. I told Sidney that `[L]ook, you've been released from the doctor, you've [received] counseling and we feel like it's time that you need to drive the truck' and I said, `I need you to drive the truck and perform your job.' And he said, `I can't do it, I'm scared and I just can't do that.' And I said, `[O]kay, you give me no other alternative but to terminate you effective immediately.'"
Phillips's version of that meeting is identical in all material respects.[5] The employee-termination notice completed by Pat Kerce that same day stated the following as the reason for discharge: "Did not want to drive truck following rollover. No other work available to match his skills/exp." The separation notice filed with the Georgia Department of Labor, also completed on July 31, 2001, likewise stated: "Employee did not want to drive trucks." All this evidence is consistent with and supports Blue Circle's assertion that Phillips's employment as a truck driver was terminated because he would not drive a cement *1033 truck when he was asked to do so immediately before he was discharged.
However, Phillips argues on appeal that Blue Circle has advanced not one, but three different reasons to explain why he is no longer employed by Blue Circle: (1) that he quit or self-terminated; (2) that he was discharged because he did not want to drive a truck; and (3) that he was discharged because he was unwilling to drive a truck. In an effort to support this argument, Phillips isolates excerpts of testimony given by different Blue Circle officials and claims that the difference in the officials' word choice indicates that Blue Circle has disavowed its stated reason for Phillips's discharge, thus making a judgment as a matter of law inappropriate. However, as shown below, although Blue Circle officials did not use the same exact words when describing the circumstances surrounding Phillips's discharge, their testimony was consistent overall and supports the stated basis for Phillips's discharge  that Blue Circle terminated Phillips's employment because he would not drive a truck at the time he was discharged. Nowhere has Blue Circle disavowed that reason or ever acknowledged it as pretextual.
Phillips bases his argument on excerpts of the deposition testimony of Kerce and Swierenga that were read at trial. While being deposed by Phillips, Kerce testified as follows:
"Q: Sidney Phillips was fired. Is that true?
"A: Sidney Phillips was released from the doctor and was  and didn't want to go back to driving a truck, and so  and that's the reason we put down on the separation as we did. He wasn't fired for a reason of not performing or whatever. It's simply he didn't want to go back on the truck. There was no other position available, so he chose not to go back on the truck.
"Q: Well 
"A: And there was nothing else there.
"Q: I don't want to get into a semantic debate with you. I really don't. But in my mind, in handling these types of cases that I handle, it has occurred to me that there are three ways that your employment with a company can end. You can quit, you can be fired, or you can die.
"A: Uh-huh.
"Q: I don't know of any others. Would you agree with that?
"A: I would agree.
"Q: All right. We know Sidney didn't die.
"A: Right.
"Q: Did he quit?
"A: Yes, but we explain it on there that he was released from the doctor, you know, he didn't want to drive the truck anymore. That was basically the bottom line of it.
"Q: Now, if he has quit, then that would be a voluntary termination of employment, would it not?
"A: Yes.
"Q: As part of your job, would you find it critically important to keep accurate records on employment issues?
"A: Yes.
"....
"Q: [Referring to employee-termination notice:] Now tell me if I'm wrong, but the way that looks to me is it looks like somebody started to check the box `voluntary' and scratched it off and then checked the box `discharged.' Is that right?

*1034 "A: Yes.
"Q: Who did that?
"A: I did.
"....
"Q: [Referring to the statements written by Phillips and Dukes on June 27:] Did you see anything in either one of these documents that indicates that Sidney Phillips does not want to drive the truck?
"A: No, sir.
"Q: The first sentence I see to the concept of Sidney Phillips does not want to drive the truck are in these two exhibits that you signed [employee-termination notice and separation notice filed with Georgia Department of Labor] that were created on July 31, 2001. Am I correct in that?
"A: Correct.
"Q: Do you know where you got the concept of he didn't want to drive the truck, that it was not his desire to drive the truck?
"A: It came from Harold Kee. And this is what  this is what we fill out when we get the call from a manager and we're talking about, you know, what's going to happen. But Harold's words were [Phillips] did not want to drive the truck anymore following the rollover. They had looked for work, and I know I had been involved with that to look for work and that no other work was available, so that's the way that they were  he did not want to drive a truck following the rollover. It didn't mean that there wasn't some reason that he didn't want to go drive it, but of course, we didn't feel like that on these documents we should go into all that because, you know, he simply didn't want to drive anymore following the accident and that's what we knew about it. He had a fear of the truck, didn't want to go back to drive it, so, you know, there was no other work available for him."
While being deposed by Phillips, Swierenga testified as follows:
"Q: Tell me, I want to know the discussions that were had. Who was present, what was said regarding the decision to fire Sidney Phillips?
"A: It would have been me, Pat [Kerce], John [Richardson], Keith [Dukes]. I don't know if Keith Dukes was there. Harold Kee was Keith's supervisor, but for sure I know John and I and Pat were, and I think Harold was and I think we had Keith at one point.
"Q: What all was said?
"A: Evaluating the case, that, you know, we had a release for him to drive a truck, he didn't want to drive the truck, we didn't have other work available, so we terminated him.
"Q: Let's look back at the note that Sidney Phillips wrote in his hand which was exhibit 21. Do you see anywhere in there an expression by Sidney Phillips that he does not want to drive a truck?
"A: It just simply states, `I feel like'  or `I feel that I'm not ready to drive at this time.'
"Q: He says, `I'm not ready to drive.' Exhibit 22, the one from Mr. Dukes, `Sidney says he is uncomfortable driving.'
"A: Right.
"Q: Do you see that?
"A: That's probably part of the same conversation.

*1035 "Q: Probably was, but what I don't see is either Keith Dukes and his group, exhibit 22, or Sidney Phillips, exhibit 21, saying that Sidney Phillips did not want to drive the truck.
"A: He said he wasn't able to drive.
"Q: Where did he say that?
"A: Well, one or the other.
"Q: I don't see that either.
"A: It was one of the other documents.
"Q: I'll hand you all the exhibits.
"A: Well, I mean, I can take the time to look through them, but I mean, the bulk of the conversation was Sidney Philips was released to work.
"Q: By the orthopedic doctor.
"A: By the doctor, right. We had a release.
"Q: Well, let me  Go ahead and finish or let me tell you, maybe get us focused on what I'm trying to get to. You can finish your answer if you'd like to.
"A: It's that simple. We had a release for him to work and according to that one document from Keith, we gave him a day  you know, he had a day off. We were trying to get him back into the truck and he  somewhere  I don't know that he stated that he was  that he was scared to drive or, you know, like he wrote there, he was uncomfortable driving. So we asked him are you saying you're not going to drive the truck? And it's not documented, but I recall that, you know, those were the questions. The discussions that we had amongst ourselves, Sidney had a release and he's not willing to get in the truck. So if he's not going to drive and we don't have a job for him, his employment is terminated.
"Q: Well  I'm sorry. Go ahead.
"A: No. Go ahead. That's it.
"Q: Was there a discussion about whether this was going to be a voluntary termination or a firing?
"A: I think certainly the  you know, Sidney, by stating that he was not able or couldn't drive or wouldn't do that job, was terminating himself. That's the job that we had for him and if he was not able to do it, we'd have to formally discharge him. He did not walk in and turn in a resignation, no.
"Q: Well, do you view this as a voluntary termination?
"A: Because he didn't formally walk in and hand me a resignation, I would say no. Technically, it was not a voluntary termination, but when he was released to work, we had work and he elected not to do it, not to be comfortable with it, to tell us he was scared to not [sic] do what he was hired to do. We effectively no longer had a position for him because he was hired to be a truck driver.
"Q: We've got another form here, also a corporate form [separation notice filed with Georgia Department of Labor], and it's recorded on there `employee did not want to drive trucks,' end quote. Do you see that?
"A: Yeah.
"Q: Well, here's where I'm going. I see your two corporate forms [employee-termination notice and separation notice filed with Georgia Department of Labor], that both say Sidney Phillips did not, quote, `want to drive truck,' end quote. I *1036 don't see anywhere in Sidney's exhibit 21 or in the Keith Dukes's exhibit 22 where Sidney ever said `I don't want to drive a truck.' The only thing I see Sidney Phillips saying is that he needs more counseling and I see Keith Dukes saying he's not comfortable driving a truck.
"A: And was there anything in Keith Dukes's testimony where he specifically asked Sidney `Are you saying you can't drive a truck?' Because those words were part of the conversation that we had as part of this discussion.
"Q: I don't remember.
"A: Sidney Phillips was not getting  he was not going to drive a truck and he did not want to drive that truck.
"Q: Did you understand from the perspective of Sidney Phillips  or what was your understanding from the perspective of Sidney Phillips why Sidney did not want to drive a truck?
"A: Well, he said he was scared.
"Q: And what else?
"A: Well, here he said he needed more counseling.
"Q: Prior to the firing, you either reviewed Sidney's handwritten note and Keith Dukes's typed note, exhibits 21 and 22, or you were told of the contents of those notes, correct?
"A: Yes.
"Q: You had a meeting with several other people that you've identified for us previously to discuss essentially what are we going to do now? And as I understand it, what happened next, you had a conversation by telephone with Keith Dukes and told Mr. Dukes to issue Sidney Phillips an ultimatum.
"A: Wouldn't have been me directly, right, because Keith doesn't work for me. We had group conversation with Keith's supervisor Harold, Pat Kerce, myself. I believe John Richardson was on the call to make sure we were clear and we understood what the issues were and that we were acting within the scope of company procedure.
"Q: This termination was carried out in accordance with [Blue Circle] procedure?
"A: As far as the process, yes.
"Q: And as far as the result.
"A: The result?
"Q: Well, what besides the process is there?
"A: Well, certainly, you know, we don't  you know, every termination is carefully reviewed by the [human-resources] group, and I was involved specifically in this one because it also involved a worker's compensation injury claim and just from a procedure and protocol standpoint, we needed to make sure that we were following company procedures and not doing anything that we shouldn't do.
"Q: And under these circumstances, company procedure was that Sidney Phillips was to be fired.
"A: Sidney Phillips was fired because he was not willing or able or uncomfortable [sic] to drive a truck. We had a doctor's release for him to drive the truck. That was the job we had for him.
"Q: Keith Dukes said on page 33 of his deposition, question, `Who called you and what did they say?' Answer, `If I remember right  and I *1037 won't be a hundred percent sure  I believe it was John and he said tell Sidney he has a choice to get back in the truck or be terminated.' `Was it John Swierenga or John Richardson?' He wasn't sure and he botched your name worse than I have when he was trying to recall your name. I remember that. But in any event, the gist of Mr. Dukes's testimony 
"A: Right.
"Q:  and my point is not for purposes of this question are you the person that told Keith to do that, but as a consensus decision of the group that you were in. Was it decided that Keith Dukes would take that ultimatum to Sidney Phillips?
"A: Yes. Keith Dukes was Sidney's direct supervisor.
"Q: And was it left to Keith to call us back and tell us how Sidney responds to the ultimatum?
"A: I don't recall, but certainly that would be  that would be part of the process. You know, if Sidney refuses to go do his job, then we've got to evaluate what to next  what's next.
"Q: Well, I'm just trying to get the instruction down here. What was  was what was communicated to Mr. Dukes tell Sidney he has a choice to get back in the truck or be terminated and by the way, Mr. Dukes, if he does not choose to get back in the truck, tell him he's fired?
"A: He's effectively terminating himself."
Even when this Court considers this testimony and the whole of the evidence presented in the light most favorable to Phillips, as we must, see City of Birmingham v. Sutherland, 834 So.2d 755, 758 (Ala. 2002), we cannot conclude that there is substantial evidence indicating that Blue Circle ever disavowed, or acknowledged as pretextual, the reason it gave for terminating Phillips's employment  that he would not drive a truck after being ordered to do so. Phillips now makes much of the fact that Blue Circle officials at times characterized his choice not to drive as an "unwillingness" to drive and at other times stated that he did not "want" to drive. However, that is a distinction without a difference. The relevant fact  which Phillips has never disputed  is that he would not agree to resume driving a cement truck when given the ultimatum that he do so or be discharged. Thus, it is in no way inconsistent to say that Phillips, when he made the decision not to drive in the face of an ultimatum by his employer ordering him to do so or be fired, was both unwilling to drive and did not want to drive.[6]
Phillips has also argued that Kerce and Swierenga have claimed that he quit or self-terminated his employment and that those statements indicate that Blue Circle has disavowed the stated reason for his discharge. However, an examination of Kerce's and Swierenga's entire testimony indicates that their descriptions of the circumstances *1038 of Phillips's discharge are entirely consistent with the testimony of every other witness, including Phillips  that on July 31, 2001, Phillips was given the choice of resuming driving a cement truck or having his employment terminated and that when he declined to resume driving, he was immediately discharged. Neither Kerce, Swierenga, or any other Blue Circle employee ever claimed that Phillips tendered his resignation. Rather, as Swierenga explained, Phillips, by choosing not to drive after being advised that that choice would lead to his immediate discharge, "effectively terminat[ed] himself." Considering the circumstances in which Phillips's employment was terminated and the entirety of the testimony, no "fair-minded person[ ] in the exercise of impartial judgment [could] reasonably infer" that Kerce or Swierenga disavowed the stated basis for Phillips's discharge  that he would not drive a cement truck  when they agreed under questioning that he quit or self-terminated his employment. West, 547 So.2d at 871.
In considering this case and whether Blue Circle ever disavowed, or acknowledged as pretextual, the stated reason for Phillips's discharge, we find it instructive to compare this case to others in which we have considered whether an employer has subsequently disavowed a reason given for discharging an employee. In Flint Construction Co. v. Hall, supra, the discharged employee was initially told that his employment was being terminated because no work was available. However, the employer subsequently admitted that there was, in fact, no lack of work and stated that its real reason for discharging the employee was that he had had too many absences and that he had been gambling in casinos when he was supposed to be working or undergoing medical treatment. This Court held that the employer was not entitled to a judgment as a matter of law because the employer itself had acknowledged the pretextual status of the initial reason given for the employee's discharge. 904 So.2d at 252 (stating that "a [judgment as a matter of law] is not appropriate where, as here, the employer subsequently contradicts the reason it initially gave for the discharge, thereby at least implicitly disavowing it or by such action acknowledging its pretextual status").
We next compare Flint with Robinson v. Alabama Central Credit Union, 964 So.2d 1225 (Ala.2007), in which the employee argued that a judgment as a matter of law was inappropriate because, he claimed, the employer had given the following, allegedly contradictory, reasons for his discharge: (1) the employer was simply "`"going in a new direction"'" and the discharge "`"wasn't about [the employee]"'"; (2) the employee was discharged "`"as part of a restructuring"'"; (3) "`"the primary reason [for the discharge] was cost,"'" although there were "`"some performance issues as well"'"; and (4) the employer was "`"displeased with [the employee's] lack of initiative and the extensive and expens[ive] use of outside vendors."'" 964 So.2d at 1230. In concluding that the employer was entitled to a judgment as a matter of law, this Court, in a plurality opinion, stated:
"We cannot agree that these reasons are `inconsistent and contradictory.' To the contrary, the evidence cited by [the employee] appears to be entirely consistent with [the employer's] stated reason for terminating [the employee's] employment  that, after reviewing his job duties and performance, it was decided `that it would be beneficial to the Credit Union to outsource many of [the employee's] primary functions and have a lower-grade marketing person to merely coordinate and assist the outside agency to perform those functions.'

*1039 "... [This employer], unlike the employer in Flint [Construction Co. v. Hall, 904 So.2d 236 (Ala.2004)], has never disavowed a reason it has given for terminating [the employee's] employment. [The employer] has consistently maintained that the decision to terminate [the employee's] employment was a business decision made as part of a restructuring process. That [the employee's] performance was considered in the context of making that decision in no way indicates that that reason is anything other than legitimate."
Robinson, 964 So.2d at 1230. The facts in the present case are clearly more analogous to Robinson than Flint. Unlike the employer in Flint, but like the employer in Robinson, Blue Circle has never disavowed the reason it gave for Phillips's discharge. Rather, Blue Circle has consistently maintained that Phillips's employment was terminated when he would not resume driving after he was ordered to do so and after being told he would be fired if he did not do so. Phillips's argument that Blue Circle has disavowed this stated reason or has otherwise acknowledged its pretextual status is simply not supported by substantial evidence.

IV.
This Court stated in Aldridge that "if there is uncontradicted evidence of an independently sufficient basis for the discharge then the [employer] is entitled to a judgment as a matter of law." 854 So.2d at 568. Blue Circle has presented such evidence, and Phillips has failed to show that a judgment as a matter of law was otherwise inappropriate. Because a determination can be made that, as a matter of law, Blue Circle did not terminate Phillips's employment "solely because [Phillips] ha[d] instituted or maintained any action against [Blue Circle] to recover workers' compensation benefits," see § 25-5-11.1, the trial court erred in failing to grant Blue Circle's motion for a judgment as a matter of law on that basis. Accordingly, we pretermit consideration of Blue Circle's argument that the damages award was excessive. The trial court's order denying Blue Circle's motion for a judgment as a matter of law is reversed, and the case is remanded for the trial court to enter a judgment as a matter of law for Blue Circle.
REVERSED AND REMANDED.
SMITH, BOLIN, and PARKER, JJ., concur.
SEE, J., concurs specially.
MURDOCK, J., concurs in the result.
COBB, C.J., and LYONS and WOODALL, JJ., dissent.
SEE, Justice (concurring specially).
I concur fully in the main opinion. I write specially to address the statement in Chief Justice Cobb's dissent that Phillips "lost his job even though the evidence is undisputed that he never refused to drive and on the readily apparent ground that Blue Circle was simply unwilling to pay for any further treatment." 989 So.2d at 1041.
What is apparent from the record is that Phillips admits that he was fired after he stated, in writing: "`I feel like that I am not ready to drive at this time.'" Phillips's brief at 18. Notwithstanding this admission, Phillips denied at trial that he had "refused" to drive. Yet, when questioned on cross-examination regarding the meeting at which he was fired, Phillips testified: "I went in there and [Keith Dukes] said, `[W]ell, me and David Ruth [a dispatcher] has come to the understanding that since you're not willing to drive, since we don't have anything that you're qualified *1040 to do, you're terminated."' Also, it was Phillips who offered the deposition testimony of John Swierenga to the effect that "Sidney Phillips was fired because he was not willing or able or uncomfortable [sic] to drive a truck. We had a doctor's release for him to drive the truck. That was the job we had for him." Blue Circle maintains that Phillips indicated that he was "unwilling/unable to drive a truck." Blue Circle's brief at 16. More importantly, however, no matter how one characterizes Phillips's refusal or inability to drive the truck on Tuesday morning, July 31, 2001, the question § 25-5-11.1, Ala.Code 1975, puts before this Court is whether Phillips presented substantial evidence from which the jury could do more than speculate that his employment was terminated solely because he had made a workers' compensation claim and not at all because he refused or was unable to drive. He failed to present such evidence, and all else is extraneous.
MURDOCK, Justice (concurring in the result).
I view this case not so much as one in which the employee refused to perform the duties of his job, but one in which the employee was unable to perform those duties. Because the record indicates that the termination of employment in this case was a result of the employee's inability to perform his job duties, and not in retaliation for filing a claim for worker's compensation benefits, I concur in the result. See Bleier v. Wellington Sears Co., 757 So.2d 1163, 1172 (Ala.2000) ("[W]hen the law does not require an employer to create a job or to provide special accommodations, the employer cannot be penalized for failing to do so and, instead, discharging an employee who is not able to perform the duties of his job, so long as the discharge is not based on the employee's filing a workers' compensation claim." (emphasis added)), and Jim Walter Res., Inc. v. Riles, 920 So.2d 1093, 1102 (Ala.Civ.App. 2004) (to the same effect).
In Flint Construction Co. v. Hall, 904 So.2d 236, 252 (Ala.2004), this Court recognized that when an employer contradicts the reason it initially gave for a discharge, that contradiction may itself be evidence that the given reason was pretextual. Based on this principle, in Robinson v. Alabama Central Credit Union, 964 So.2d 1225 (Ala.2007), I declined to join the rationale of the main opinion, instead concurring in the result and "question[ing whether the varying explanations given by the employer] for terminating the [employee's] employment do not create a genuine issue of fact as to whether any one of those explanations is pretextual." 964 So.2d at 1232. I have no such question in the present case. I see no contradiction in the reasons given for terminating Phillips's employment. Rather, the different ways in which the reason for the termination of Phillips's employment have been articulated are simply different ways of saying the same thing; the essence of each of these articulations is that Phillips was unable to perform the duties required by his job.
COBB, Chief Justice (dissenting).
I respectfully join Justice Lyons's dissent, and I concur wholly with his rationale. However, I write to note some of the particular factual aspects of this case that I believe should be stated. As is evident from its verdict, this is a case in which the jury found facts that supported a conclusion that Phillips had suffered significant injury and, further, that Blue Circle's conduct in causing that injury was in large part reprehensible. Even with the reduction of the punitive-damages award, it is plain that the trial court also concluded that Blue Circle's conduct was sufficiently egregious to warrant a substantial *1041 penalty. The facts omitted in the main opinion include Blue Circle's policies asserting that workers, particularly truck drivers, should freely report safety concerns and that they should seek treatment for injuries in order to promote employee and public safety pursuant to Blue Circle's "open door" policy. Thus, the employee handbook given to Phillips stated:
"It is the obligation of each employee to observe the safety regulations, to use the safety equipment provided for him or her and to practice safety at all times. An employee who observes a hazardous condition, an accident, a violation of safety rules or other unsafe circumstances is required to report this to his or her supervisor or the Safety Department immediately. The Safety Department is available for questions, discussions and training relative to safety in your job."
Of course, it is true that the handbook makes no statement about a worker's rights in the event he or she follows these policies.
The record shows that Phillips enjoyed his work with Blue Circle and that his work had merited a pay raise in April 2001, some three months before his accident and the subsequent termination of his employment. The record also presents considerable medical evidence detailing Phillips's post-traumatic stress disorder as a result of his accident, which included loss of sleep and anxiety sufficiently extreme that his case-management nurse at Blue Circle recommended medical treatment by Dr. Steve Brown, a counselor, and Dr. Brown recommended follow-up evaluation and counseling. Phillips was subsequently told by his case-management nurse to seek further treatment as he required. A short time later, and immediately after his first attempt at driving a truck singlehandedly following the accident, he reported that he was suffering from flashbacks and anxiety that made his driving unsafe; he requested additional treatment from his case-management nurse and, in a written request, from his supervisor. That written request was sent by telefax to Blue Circle's manager in charge of workers' compensation, John Swierenga. Swierenga's response, made with knowledge that Blue Circle had already paid for Phillips's earlier treatment, was described by Keith Dukes, Phillips's supervisor, as follows:
"Q. Okay. And as a product of you faxing these over to Atlanta, what comes back to you is a call from Mr. Swierenga that says give him the ultimatum, drive or be fired.
"A. Yes, sir.
"Q. In your conversation with Mr. Swierenga where he gives the order give him the ultimatum, Mr. Swierenga says nothing to you whatsoever about offering counseling.
"A. No, sir."
Thus, Phillips was fired four days after he requested the additional treatment Blue Circle had encouraged him to seek. He lost his job even though the evidence is undisputed that he never refused to drive and on the readily apparent ground that Blue Circle was simply unwilling to pay for any further treatment.[7]
*1042 After Dukes's testimony, Blue Circle presented contradictory evidence concerning the three different bases for Phillips's loss of employment that Justice Lyons's dissent ably discusses: (1) that he was fired because he had refused to drive, (2) that he was fired because he was unwilling to drive, and (3) that he had quit voluntarily. This evidence, in addition to the evidence discussed in the main opinion, provided the jury with an ample basis from which to conclude that Blue Circle fired Phillips because he was seeking treatment for a condition caused by an accident while he was in Blue Circle's employment. I believe that the main opinion effectively undermines Alabama's workers' compensation statute governing retaliatory discharge and invades the province of the jury in determining the facts. Accordingly, I dissent.
LYONS, Justice (dissenting).
The main opinion concludes that because there is undisputed evidence of an independently sufficient basis for Sidney Wayne Phillips's discharge, i.e., Phillips's inability to drive the cement truck, Blue Circle was entitled to a judgment as a matter of law. There is something that is just too pat[8] about the reliance on the right to discharge for inability to perform as the basis for a defense to a retaliatory-discharge claim under the facts of this case. Blue Circle's reply brief, at pages 24-25, succinctly summarizes the basis for the holding in the main opinion:
"The one overriding point that Phillips cannot ignore is that by his own admissions he could/would not drive a truck the job position which he held at Blue Circle. This Court has made it clear that an employer is not required to create a job or to provide special accommodations for an employee who is not physically or mentally able to perform the duties of his job. Bleier v. Wellington Sears Co., [757 So.2d 1163,] 1172 [(Ala. 2000)]; Jim Walter Resources, Inc. v. Riles, 920 So.2d 1093, 1102 (Ala.Civ.App. 2004). If Blue Circle had no legal obligation to assign Phillips to a non-driving position while he coped with the alleged mental problems arising from his accident, then Blue Circle had the absolute right to terminate him. When it did so, it did not subject itself to a retaliatory discharge claim because Phillips could not meet his burden of proving that the discharge was solely because he had filed a compensation claim. The failure of Phillips to meet his burden of proof renders his retaliatory discharge cause of action legally deficient thereby warranting entry of judgment in favor of Blue Circle."
In Bleier v. Wellington Sears Co., 757 So.2d 1163 (Ala.2000), this Court held that the willing-and-able-to-return-to-work doctrine was not an element of a worker's compensation claimant's prima facie case of retaliatory discharge, but the question whether the claimant is willing and able to return to work is relevant to the employer's opportunity to establish a defense to a retaliatory-discharge claim.
If the employee's inability to work is relied upon in a setting where the employee has not reached maximum medical improvement, the delicate balance that must be struck between the at-will-employment *1043 doctrine and the right to sue for retaliatory discharge is disrupted.
"We must construe § 25-5-11.1[, Ala. Code 1975,] in a manner that effectuates the obvious legislative intent to protect an employee from a retaliatory discharge based solely on the employee's filing a workers' compensation claim. However, at the same time, we must refrain from construing § 25-5-11.1 in a manner that revises the at-will doctrine beyond the extent necessary to accommodate the obvious legislative purpose."
Bleier, 757 So.2d at 1169.
Here, Phillips requested additional counseling after his first solo ride in the cement truck following the accident and was told it would cost too much. He was discharged soon thereafter. As Justice Johnstone noted in his special concurrence in Bleier:
"I concur, but with the qualification that the defense that the employee was discharged for unwillingness or inability to do the job will not be recognized unless, at the time of discharge, either (1) the employee was able but was unwilling to do the job or (2) the employee had reached maximum medical improvement. For example, the employer will not be allowed to contend that its reason for discharging the employee was that he was recuperating in the hospital from his on-the-job injury and thus was unable or unwilling to do the job."
757 So.2d at 1173 (Johnstone, J., concurring specially). Based on the foregoing, the defense that he was unable to do the job should not defeat Phillips's claim as a matter of law, as Blue Circle contends, because Blue Circle would have to have shown not only that Phillips was unable to perform his duties, but also that he would not have been cured of his disability by provision of the benefits required of Blue Circle under the Workers' Compensation Act in order to rely on this basis for discharge. Blue Circle offered no such evidence.[9]
Moreover, even assuming that Blue Circle was entitled to rely on the inability to work as a basis for discharging Phillips, Blue Circle offered conflicting and shifting versions of the basis for the discharge. In Alabama Power Co. v. Aldridge, 854 So.2d 554, 568 (Ala.2002), we set forth the rule to be applied when the defendant has offered uncontradicted evidence of an independently sufficient basis for discharge and the plaintiff has contended that the basis was pretextual. We held:
"A plaintiff, therefore, has the burden of presenting sufficient evidence indicating that the plaintiff was discharged because he or she filed a claim for workers' compensation benefits, but if there is uncontradicted evidence of an independently sufficient basis for the discharge then the defendant is entitled to a judgment as a matter of law.... An employer's stated basis for a discharge is sufficient as a matter of law when the underlying facts surrounding the stated basis for the discharge are undisputed and there is no substantial evidence indicating (a) that the stated basis has been applied in a discriminatory manner to employees who have filed workers' *1044 compensation claims, (b) that the stated basis conflicts with express company policy on grounds for discharge, or (c) that the employer has disavowed the stated reason or has otherwise acknowledged its pretextual status."
If we assume that Blue Circle is entitled to rely on Phillips's inability to work as the basis for his discharge, this case turns on whether Phillips offered substantial evidence showing "that [Blue Circle] has disavowed the stated reason or has otherwise acknowledged its pretextual status." Id.
Phillips testified that he needed further counseling because he was unable to drive the cement truck "at this time." Blue Circle's witnesses variously described Phillips's discharge as quitting because he did not want to drive anymore or being fired because he did not want to drive anymore or being fired because he was unwilling to drive anymore. Of course, if Phillips quit, he would have no retaliatory-discharge claim. Kent Corp. v. Hale, 699 So.2d 954, 958 (Ala.1997) ("Thus, an employee who has not been terminated, either actually or constructively, has not presented a prima facie case of retaliatory discharge, and, in such a case, the defendant would be entitled to a [judgment as a matter of law] on that claim.").
In addition to the differing characterizations of the circumstances surrounding his discharge by various Blue Circle witnesses, Phillips also points to evidence indicating that a block on a form was initially checked to indicate his voluntary resignation and was later changed to reflect involuntary discharge. The main opinion dismisses the details as to the various reasons for his discharge as a distinction without a difference. But, as previously noted, a substantial difference would have resulted if Blue Circle could have established that Phillips had voluntarily resigned; there would be no liability for retaliatory discharge.
What is clear is that we have Blue Circle's inability to get the story straight in a few words of plain English, a failing that comes after much huddling and planning to get the discharge handled correctly by personnel whose bonuses were affected by the volume of workers' compensation claims. I believe we have invaded the province of the jury and reweighed the evidence in favor of the view that Phillips was discharged for refusing to drive a cement truck when ordered to do so without recognizing that a jury question exists as to whether that reason was a pretext. We should not dismiss the undisputed evidenceassigning various descriptions of the circumstances ranging from "he quit" and "he voluntarily terminated himself" to "he was fired" for various reasons including inability and unwillingness to drive, and the existence of a form that at one time reflected a voluntary resignationas insufficient as a matter of law to establish a jury question as to either disavowal of the variously stated reasons or other acknowledgment of the fact that those reasons were pretextual. The jury could have reasonably believed from the foregoing evidence that Blue Circle wanted to discharge Phillips for asserting a claim for benefits under the Workers' Compensation Act, that Blue Circle initially wanted to call Phillips's discharge a voluntary resignation, that it soon came to the conclusion that it could not plausibly do so, and that it then shifted to calling it an involuntary discharge with the hope that by severing connection with him he would not persist in his claim for further counseling, an expensive course of treatment.
In summary, I conclude that the trial court did not err in denying Blue Circle's motion for a judgment as a matter of law on either of two alternative bases: (a) that *1045 the defense of inability to perform as a basis for discharge was not available to Blue Circle absent proof of the futility of further rehabilitation or (b) that, assuming the defense of inability to perform was available, the shifting of the reasons for discharge from voluntary to involuntary presents a question for the jury as to whether the ground ultimately relied uponPhillips's inability to drive a cement truckwas a pretext. I must therefore respectfully dissent.
COBB, C.J., concurs.
NOTES
[1] Phillips was initially hired by Blue Circle Cement Inc.; however, Lafarge Building Materials Inc. acquired Blue Circle Cement shortly before Phillips's employment was terminated.
[2] Harold Kee was the general manager for the western Georgia area.
[3] Pat Kerce was a human-resources manager.
[4] Phillips testified that he never "refused" to drive a truck, but he does not dispute that he was unwilling to drive a truck when given an ultimatum asking him to do so on July 31, 2001. Although Phillips may not have used the word "refuse" then and may not characterize his decision not to comply with his employer's directive as a "refusal," it was, by any commonly accepted definition of the word, precisely that. See, e.g., Merriam-Webster's Collegiate Dictionary 1047 (11th ed.2003) (defining "refuse" as "to express oneself as unwilling to accept" or "to show or express unwillingness to do or comply with").

Moreover, the Blue Circle officials certainly viewed Phillip's unwillingness to drive as a refusal. Swierenga testified that "when [Phillips] works for us for four weeks and everything is going along like it should with the recovery and then he refuses to drive the truck and he puts this in writing, we just take that into the scope of the evaluation." (Emphasis added.)
Nevertheless, Chief Justice Cobb states in her dissent that Phillips "lost his job even though the evidence is undisputed that he never refused to drive." 989 So.2d at 1041. This statement is perplexing in light of the fact that it is directly contradicted by the facts and the record.
[5] Phillips did not describe, at trial, what Dukes said to him when he was discharged; however, Phillips stated in his deposition that "[h]e said, `Sidney, since you're not willing to drive and since we don't have anything that you're qualified to do, you're terminated.'"
[6] Moreover, Kerce made clear in her testimony that she was aware, when she wrote on the corporate records that Phillips did not want to drive, that Phillips had a reason for feeling that way:

"[H]e did not want to drive a truck following the rollover. It didn't mean that there wasn't some reason that he didn't want to go drive it, but of course, we didn't feel like that on these documents we should go into all that because, you know, he simply didn't want to drive anymore following the accident and that's what we knew about it. He had a fear of the truck, didn't want to go back to drive it, so, you know, there was no other work available for him."
[7] When presented with the ultimatum by Blue Circle, Phillips told Dukes that he was mentally unable to safely drive "at that time." He was emphatic that he wanted to keep driving for Blue Circle and that he was not refusing to do his work as soon as he received the necessary treatment to permit him to do it safely. Moreover, he was following company requirements in reporting a safety concern. Although it is apparent that Swierenga was anxious to view Phillips's response as a refusal so as to supply a rationale for the termination of his employment, Phillips's testimony was not contradicted. In fact, the documentation of the conversation by Dukes, and his recollection, nowhere indicates that Phillips had refused to drive.
[8] "Patadjective 1. exactly to the point or purpose; apt; opportune: a pat solution to a problem. 2. excessively glib; unconvincingly facile: His answers were too pat to suit the examining board." (On the date this opinion was released, this information could be accessed online at: http://dictionary.reference. com/browse/pat.)
[9] By focusing upon Phillips's inability to perform the work of a truck driver at a point when the treatment to which Phillips was entitled under the Workers' Compensation Act had not been provided, the main opinion has sub silentio overruled Bleier v. Wellington Sears Co. and made being able to perform the work a part of the prima facie case for those employees who have filed a claim and have not received treatment at the time of their discharge. If Phillips had received all the treatment to which he was entitled under the Workers' Compensation Act, then Justice Murdock's observations regarding Bleier in his special writing would be applicable.